Albert Lewis HUGGINS *v.* STATE of Arkansas

CR 94-564 907 S.W.2d 697

Supreme Court of Arkansas
Opinion delivered October 9, 1995

*Addie M. Burks*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. This is a capital case where the appellant, Albert Lewis Huggins, was convicted of murdering Clark White and sentenced to life imprisonment without parole.

Huggins was further convicted of theft of an automobile and sentenced to 20 years imprisonment. On appeal, he argues that the evidence was insufficient to sustain the judgments. We disagree, and we affirm.

Clark White, also known as Troy White, was an employee of the Crittenden County Sheriff's Department Drug Task Force. Although White worked for the Drug Task Force, he had a friendship with Huggins and a third man, Mark Lewis, also known as Renee Lewis, which involved smoking crack cocaine together. Lewis, who testified for the State at the ensuing trial, provided much of the factual background in this case.

Clark White had a credit arrangement with Huggins and Booker T. Shelton, a crack cocaine supplier in Memphis, Tennessee. Huggins would provide cocaine to White on credit with White using personal property as collateral for payment. Huggins in turn purchased the crack cocaine from his supplier, Booker Shelton. The "pawned" property would be released to White when he paid for the cocaine. On January 8, 1993, a Friday, White purchased crack cocaine from Huggins and smoked it with Lewis and Huggins at Huggins's residence in Memphis. They also drank alcoholic beverages. Early Sunday morning, January 10, 1993, White had spent all of his money, and Huggins sold him more crack cocaine on credit, using a 1987 Pontiac Firebird as collateral. White drove the Firebird, but it was actually owned by the Crittenden County Sheriff's Department. Later that day, White returned to Arkansas in a different car and cashed a $300 check at a convenience stroe to satisfy the debt to Huggins. The three men then went back to Huggins's home in Memphis to smoke more crack cocaine.

Later on that Sunday, White's money supply was again depleted, and again he used the Pontiac Firebird as collateral for $400. The three men continued to smoke crack cocaine in Memphis into Monday, January 11, 1993, but on that day they returned to Crittenden County so that White could obtain money to repay Booker Shelton and remove the Pontiac Firebird from "hock." Shelton had told Huggins to return from Arkansas with either the car or the money to pay the debt.

Huggins and Shelton would not allow White to drive to Arkansas alone in the Pontiac Firebird because they were afraid

that White would not come back. Huggins drove the car with White and Lewis as passengers to White's trailer home near Crawfordsville in Crittenden County. White's parents and brother lived next to him in separate trailers. During that same day, White began preparing chicken for the three men to eat, but at some point White and Lewis left the kitchen area to do laundry, leaving Huggins there alone. Prior to leaving, White had pulled "something" out of one of the cabinets, according to Lewis, and cut it open. When Lewis and White returned to the kitchen, Lewis saw Huggins holding White's cup and pouring beer into it. The three men had eaten the prepared food and returned to the living room area, when White "keeled over" and began foaming at the mouth. According to Lewis, he immediately got up to run to get White's mother for help, but Huggins stopped him, told him not to worry, and asked him for assistance in moving White to the couch. Huggins assured Lewis that White would be all right.

After White collapsed, Lewis heard something hit the garbage can in the kitchen. (Lewis earlier testified that this occurred when the three men were in the kitchen but later clarified this point on direct examination.) When he looked in the garbage can, he saw a plastic bottle of Sleep Away, a barbiturate agent used for putting animals to death. White had been issued the Sleep Away in 1989, when he had worked as an ordinance officer for the City of Earle. Lewis saw Huggins remove the Sleep Away container from the garbage can with a paper towel and put it in a basket or bowl in the kitchen area. Huggins subsequently admitted in a statement to State Police Investigator Edward Fitzpatrick that he used the paper towel because he did not want to leave his fingerprints on the bottle at that time. When Lewis asked Huggins what Sleep Away was, Huggins replied that it was poison for putting dogs to sleep.

Huggins got a cloth towel, put some ice in it, and placed it on White's forehead. White was still foaming at the mouth. The men stayed in the trailer for another ten minutes and then left for Memphis in the Pontiac Firebird. Both Huggins and Lewis knew at that time that the car was owned by the Crittenden County Sheriff's Department. On the way to Memphis, Tennessee, Lewis asked Huggins where the Sleep Away bottle was and Huggins replied, "Goddamn, I forgot it." The two men took the car to Memphis and gave it to Booker Shelton. They did not return to

White's trailer home. The Firebird was found some days later in Memphis in the possession of Booker Shelton.

White's body was found four days later on January 15, 1993, by his brothers. Subsequent medical examination revealed that his death was caused by a fatal dosage of pentobarbital, a barbiturate which is the active ingredient in Sleep Away. Both Lewis and Huggins were charged with premeditated capital murder in connection with the death of Mark White. Lewis pled guilty to second degree murder and theft of property and received a sentence of five years for murder and theft of property and received a sentence of five years for murder and a suspended sentence of 20 years for theft. On cross examination, Lewis first admitted and then denied making a statement to law enforcement officers that Clark White had pulled a jug from the cabinet, cut it open, and thrown the container in the trash can. Also, on cross examination, he denied making a statement that he did not see anyone but White pour contents from the container into his own cup. Lewis's statement to law enforcement officers was not introduced into evidence by the State or by the defense.

Following the jury trial, Huggins was convicted of capital murder. During the penalty phase, Huggins told the jury that he "panicked" after White drank the Sleep Away. He was sentenced to life imprisonment without parole. He was further convicted of theft of the Pontiac Firebird and sentenced to 20 years.

The crux of Huggins's appeal centers on whether the State provided sufficient evidence to support the two judgments of conviction. Evidence is sufficient to support the two judgments of convictions. Evidence is sufficient if it is substantial, that is, if the trier of fact can reach a conclusion without resorting to speculation or conjecture. *Dixon* v. *State*, 310 Ark. 460, 839 S.W.2d 173 (1992). The evidence must also be forceful enough to compel reasonable minds to reach a conclusion one way or ther other. *Id.* When a defendant challenges the sufficiency of the evidence, we do not weigh the evidence but review it in the light most favorable to the State, and only evidence supporting the verdict will be considered. *Id.; Moore* v. *State*, 315 Ark. 131, 864 S.W.2d 863 (1993).

The evidence of Huggins's guilt in this case was circumstantial. Circumstantial evidence may constitute substantial

evidence, but to do so it must exclude every other reasonable hypothesis consistent with innocence. *Trimble* v. *State*, 316 Ark. 161, 871 S.W.2d 562 (1994); *Paige* v. *State*, 45 Ark. App. 13, 870 S.W.2d 771 (1994); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993); *Bennett* v. *State*, 308 Ark. 393, 825 S.W.2d 560 (1992). Whether a reasonable hypothesis exists is for the trier of fact to resolve. *Trimble* v. *State, supra; Paige* v. *State, supra; Sheridan* v. *State, supra; Bennett* v. *State, supra.*

 Following these precepts for determining substantial evidence, we first take note of the fact that it is uncontroverted that White's death was caused by a fatal dosage of pentobarbital which is the active ingredient found in Sleep Away. Viewing this evidence in the light most favorable to the State, the following proof was amassed by the State. Huggins had the opportunity to add Sleep Away to his drink container because Huggins was left alone in the kitchen while Lewis helped White take some laundry into another room. Huggins then held White's cup and poured beer from his drink container into it. After White keeled over, Lewis heard something hit the garbage can, and when Lewis looked into the garbage can, he saw a Sleep Away container. Huggins told Lewis that the Sleep Away was a poison. After collapsing, White was foaming at the mouth and was unconscious. When Lewis began running for the door to get help from White's mother, Huggins stopped him and stated that White would be all right. Huggins and Lewis placed White on the couch, and Huggins put a towel on his head. Huggins removed the Sleep Away bottle from the garbage can with a paper towel so that he would not leave his fingerprints. On their way to Memphis, Huggins remarked to Lewis when reminded of the Sleep Away container, "Goddamn, I forgot it." Neither man notified medical or law enforcement authorities; nor did they contact White's family about White's unconscious state or the fact that he was foaming at the mouth. They further did not return to White's trailer over the next four days to check on him. We conclude that the State's evidence that Huggins perpetrated White's murder was ample in this case. Furthermore, we cannot say that the jury clearly erred in determining that there was no other reasonable hypothesis which explains White's death in light of these circumstances.

We next turn to the issue of the theft of the 1987 Pontiac Firebird. A person is guilty of theft, if he "[k]nowingly takes or exer-

cises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another with the purpose of depriving the owner thereof." Ark. Code Ann. § 5-36-103(a)(1) (1987). Again, Huggins asserts that there is no substantial evidence to support his conviction for the theft of the Pontiac Firebird owned by the Crittenden County Sheriff's Department. We believe that the following evidence is substantial.

Although White's car was actually owned by the Crittenden County Sheriff's Department, he often used the car as collateral to finance his substance abuse. White "pawned" the care in Memphis on Sunday, January 10, 1993, to purchase more crack cocaine. He then needed to travel to Arkansas to obtain the money to pay off the debt. Lewis testified that Booker Shelton, Huggins's crack cocaine supplier, instructed Huggins to return from Arkansas with either the car or the money. Huggins and Shelton would not allow White to go back to Arkansas in the car alone because they were worried that White would not return to Memphis. Huggins, Therefore, drove the three men to White's trailer. When Huggins and Lewis took the car after White collapsed on January 11, 1993, they both knew that the Sheriff's Department owned the car. Regardless of that fact, they delivered the car to Shelton.

The jury found Huggins guilty of theft and, no doubt, determined that he knowingly exercised unauthorized control of a car which belonged to the Sheriff's Department and not to White. The jury further could reasonably have inferred from what ultimately transpired that Huggins exercised unauthorized control of the vehicle in Arkansas for the purpose of delivering it to Booker Shelton in Memphis. That is enough to constitute substantial evidence of theft.

There is one final point. The theft information in this case charged Huggins with committing the offense on January 11, 1993, and the State argued in opposition to Huggins's motion for directed verdict that the theft occurred after White collapsed. At one point in its ruling, the trial court stated that the theft occurred on January 10, 1993, at the time of the "pawn" of the car in Tennessee. We disagree with that statement because it runs contrary to the information and to the State's theory of the case. Nonetheless, the trial court correctly denied the motion, even if

for the wrong reason, and we affirm its decision. *See Hagen* v. *State*, 315 Ark. 20, 864 S.W.2d 856 (1993); *Register* v. *State,* 313 Ark. 426, 855 S.W.2d 320 (1993).

The record has been reviewed for other reversible error pursuant to Supreme Court Rule 4-3(h), and none has been found.

Affirmed.

DUDLEY, NEWBERN, and ROAF, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. In its opinion, the majority has found that Albert Lewis Huggins's conviction of capital murder was supported by substantial evidence. I disagree. I also conclude the theft conviction must be reversed. Mr. Huggins may have been proven guilty of theft by receiving under Ark. Code Ann. § 5-36-106 (Repl. 1993), an offense with which he was not charged, but he was not proven guilty of theft of property as defined in Ark. Code Ann. § 5-36-103(a)(1) (Repl. 1993).

## *1. Murder*

With respect to the murder charge, the case against Mr. Huggins was entirely circumstantial. While it is well established that circumstantial evidence can constitute substantial evidence, the nature of such evidence necessarily requires a jury to rely on inferences in reaching a decision to convict the accused. A jury has a special role in circumstantial evidence cases because to render a verdict of conviction it must find the evidence is such as to exclude every other reasonable hypothesis of guilt. *Cassell* v. *State*, 273 Ark. 59, 616 S.W.2d 485 (1981); *Abbott* v. *State*, 256 Ark. 558, 508 S.W.2d 733 (1974). The standard of review of convictions based on circumstantial evidence must insure that the jury, after evaluating the evidence, was forced to conclude that the defendant was guilty of the crime charged, and that the verdict was not based on speculation and conjecture. *See Brown* v. *State*, 258 Ark. 360, 524 S.W.2d 616 (1975).

Although the decision that only one hypothesis, *i.e.*, one suggesting guilt of the accused, is acceptable belongs to the jury, our review should consider whether the evidence was sufficient to exclude other reasonable hypotheses. We have considered the existence (or nonexistence) of a hypothesis consistent with innocence when reviewing the sufficiency of the evidence. An exam-

ple is *Dixon* v. *State*, 311 Ark. 613, 846 S.W.2d 170 (1993), in which we found sufficient evidence to support the conviction but discussed and rejected an alternative hypothesis.

Although our consideration of the special role of the jury in circumstantial evidence cases, as in the *Dixon* case, may go somewhat beyond the standard of review frequently enunciated, it is the better approach, and it should always be used in cases where the circumstantial evidence connecting the defendant to the crime is sparse. In such situations, our determination whether the jury reached its verdict through speculation and conjecture of necessity takes into account other hypotheses, consistent with innocence, that would explain the defendant's behavior. Other courts have followed this course. See, *e.g., Chaudoin* v. *State*, 362 So.2d 398 (Fla.App. 1978), in which the following appears:

> Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, is not sufficient to sustain the conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence. So it is in the instant case we find implicit in the circumstantial evidence offered a possibility of innocence which is equally as strong as the possibility of guilt.

If the circumstantial evidence against Mr. Huggins on the charge of capital murder is reviewed according to this standard, I cannot conclude the conviction was supported by substantial evidence. The majority opinion indicates that substantial evidence of Mr. Huggins's guilt lies in the opportunity that he had to place the poison in Clark White's drink, which is the period when Mr. Lewis and Mr. White went to the back of the trailer, as well as Mr. Huggins's subsequent efforts to conceal the fact that he had been present when Mr. White died. In addition, the

majority mentions, as a possible motive, that Mr. Huggins was under orders to return to Memphis with either the money or the car.

The most troubling aspect of the majority view is that the undisputed instrument of Mr. White's death was just as likely, and perhaps even more likely, to have been under Mr. White's control rather than that of Mr. Huggins. Other evidence suggests at least one alternative explanation for Mr. White's demise.

Captain Greg Martin testified that Mr. White was an officer with the Earle Police Department before he joined the Crittenden County Sheriff's Department. Mr. White's first assignment with the Earle Police was as an ordinance officer, whose duties included euthanizing stray dogs not claimed by their owners. Captain Martin testified that Mr. White used Sleep Away for that purpose. On cross-examination, he stated Mr. White did not return the bottle of Sleep Away that he had in his possession when his tenure as ordinance officer was over. Mr. White thus had possession of a container of Sleep Away as well as knowledge concerning its effects as an anesthetic.

As the majority points out, Mr. Lewis testified that while he, Mr. Huggins, and Mr. White were in the kitchen, he saw Mr. White pull "something" out of the cabinet and cut it open. Mr. Lewis's testimony supports a conclusion that Mr. White not only removed the Sleep Away from the kitchen cabinet, but also made it possible for the substance to be poured.

Dr. John Stevens, a veterinarian from West Memphis, testified that Sleep Away is normally administered intravenously to dogs. The doctor also testified that Sleep Away contains a 26% concentration of the barbiturate agent sodium pentobarbital, which is a common anesthetic. Dr. Stevens also testified that whether or not Sleep Away is lethal depends upon the amount actually consumed, and he stated that if a dog were given less than the lethal amount, he would merely sleep, or be in what the doctor called "a plane of anesthesia."

Clark White and his friends had, according to Mr. Lewis, smoked 50 or 60 rocks during three days. They had been without sleep all that time. Mr. White was already late in reporting to the State Police in Jonesboro on his new assignment. It seems

plausible to me that he may have wanted to get some sleep. He could easily have miscalculated the necessary dosage.

Suicide is another reasonable hypothesis. Here was a police officer who had pawned the State's vehicle to drug dealers, been on a three-day crack binge, and missed his reporting date in Jonesboro. He might have seen death as the only way out.

Under these circumstances, the State's evidence regarding Mr. Huggins's motive and opportunity to commit capital murder, as well as his efforts to conceal the cause of Mr. White's death, must point so forcefully to his guilt that all other hypotheses are excluded. I do not believe that it does.

The majority contends that Mr. Huggins had the opportunity to put the Sleep Away in Mr. White's drink when Mr. White and Mr. Lewis left Mr. Huggins in the kitchen and went to the back of the trailer. Mr. Lewis's testimony revealed that up to that point, the three men went into the kitchen, began to cook, and Mr. White pulled "something" from the cabinet and cut it. Mr. Lewis also testified that while they were in the kitchen, he heard something, which he eventually discovered to be the container of Sleep Away, "hit the can." If the container of Sleep Away was thrown out while all three men were in the kitchen, Mr. Lewis's testimony suggests that the substance was dispensed in Mr. White's presence, if not by White himself. If that is true, then the Sleep Away was put in Mr. White's drink before Mr. Huggins's was left alone in the kitchen.

The majority has interpreted Mr. Lewis's testimony to indicate that he heard the container of Sleep Away "hit the can" after Mr. White "keeled over" in the living room. That is an erroneous interpretation. The relevant portions of Mr. Lewis's testimony during direct examination are as follows:

A. That's when, well, after we was in the kitchen, Clark was behind me, and what he was doing behind me I really didn't know.

Q. Who was?

A. Clark was standing behind me in the kitchen. We all was in the kitchen together, and he was behind me in

A. the kitchen. And, you know, I seen a knife laying on the cabinet, but I didn't know what the knife was for.

Q. Okay.

A. So I, you know, everything went so fast, and I heard something hit the garbage can.

Then, later during direct examination, Mr. Lewis testified about what happened after Mr. White collapsed:

A. Well, after Clark fell over, I remember hearing something hit the garbage can, so I walked back over to the garbage can and saw what it was.

Q. What was it?

A. It was a container of Sleep Away.

Q. All right. And when was this?

A. This was after we had went in the living room and sat down.

Q. So I get this right, what is the time frame about said you heard him hit the ground?

A. He hit the floor.

Q. All right. And then you heard what?

A. I remember the container hitting the garbage can.

Rather than changing his testimony to say that he heard the bottle being thrown away after they were all in the living room, Mr. Lewis's testimony indicates that Mr. White's falling over made him recall hearing an object hit the garbage can, and he walked over to see what it was.

The majority opinion also implies that Mr. Huggins had a motive to commit murder because he was under orders to return to Memphis with either the money or the car. Arguably, if Mr. White could not produce the money to take the car out of pawn, Mr. Huggins would have had to return to Memphis with the car. However, there is no evidence whatsoever to indicate that Mr. White could not pay to get the car out of pawn as he had done earlier in the weekend. Therefore, there is no evidence that indi-

cates why Mr. Huggins would have to murder Mr. White in order to obey his orders.

The majority also emphasizes that Mr. Huggins's guilt is indicated by his efforts to conceal the fact that Clark White died from poisoning. However, the events of the weekend preceding Mr. White's death support other explanations for Mr. Huggins's behavior. The evidence presented by the State revealed that the entire weekend was filled with illegal activity, including the sale and consumption of crack cocaine, as well as the acceptance of a pawn arrangement by a large drug operation in which Mr. Huggins was a major participant. Mr. Huggins, as a collector for the operation, was under orders to return to Memphis with the money or the car. Under these circumstances, it is likely that Mr. Huggins sought to conceal the nature of Mr. White's death in order to avoid implicating his drug operation in Mr. White's demise and returning to Memphis without something to satisfy the pawn arrangement.

The State's evidence concerning motive, opportunity, and the concealment of the manner of death simply does not force a conclusion that Mr. Huggins murdered Mr. White. In these circumstances, the evidence is not sufficient to support the murder conviction.

### 2. Theft

As to the theft conviction, the majority relies on proof that Mr. Huggins and Mr. Lewis, with knowledge that the Pontiac Firebird belonged to the Crittenden County Sheriff's Department, returned to Memphis in the vehicle on January 11, 1993. Specifically, the majority has concluded that Mr. Huggins's behavior amounted to the exercise of unauthorized control over the automobile, as prohibited by Ark. Code Ann. § 5-36-103(a)(1). I disagree.

The Trial Court was correct when he concluded that a theft occurred when Clark White pawned the vehicle, which he knew belonged to the Crittenden County Sheriff's Department. In its brief, the State rejects that conclusion, however, because it would mean that the offense occurred outside Arkansas and thus outside the jurisdiction of the Circuit Court. The argument is that we should affirm the conviction because the theft occurred when

Mr. Huggins and Mr. Lewis drove the car back to Memphis after leaving Mr. White's trailer. That is wrong because the only evidence is that Mr. White, who had a possessory interest in the car, had previously transferred possession of the car to Mr. Huggins. Huggins took possession of the car in Memphis, and his superior in the drug operation cautioned him not to allow Mr. White to drive the car for fear he would not bring it back to Memphis.

Albert Huggins' control of the vehicle does not constitute "theft" as is defined in Ark. Code Ann. § 5-36-103(a). The more appropriate charge under these circumstances would have been for theft by receiving, which is set forth as follows in Ark. Code Ann. § 5-36-106:

> (a) A person commits the offense of theft by receiving if he receives, retains, or disposes of stolen property of another person, knowing that it was stolen or having good reason to believe it was stolen.

> (b) For purposes of this section, "receiving" means acquiring possession, control, or title or lending on the security of the property.

> (c) The unexplained possession or control by a person of recently stolen property or the acquisition by a person of property for a consideration known to be far below its reasonable value shall give rise to a presumption that he knows or believes that the property was stolen.

Mr. Huggins could have been charged with theft by receiving even though he initially received the car in Memphis because theft by receiving is a continuing offense. *State* v. *Reeves*, 264 Ark. 622, 574 S.W.2d 647 (1978). Mr. Huggins was simply mischarged, and we should not affirm a conviction of an offense which did not occur.

I respectfully dissent.