Johnny MILLS *v.* STATE of Arkansas

CR 95-150 910 S.W.2d 682

Supreme Court of Arkansas
Opinion delivered December 4, 1995

648

650

*Val P. Price*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The catalyst for this appeal was

the conviction of the appellant, Johnny Lee Mills, for capital murder and his sentence of life imprisonment without parole.[1] Mills appeals on seven grounds: (1) insufficient evidence for capital murder and the underlying felonies; (2) failure of the State to provide exculpatory information as part of discovery; (3) tainted photographic lineup and in-court identification; (4) failure to suppress illegally seized blood; (5) failure to allow into evidence a tape and transcript of a hypnotherapy session with a defense witness to refresh the witness's recollection; (6) failure to exclude a photograph of a pickup truck without proper foundation; and (7) error by the trial court in overruling Mills's objection to an allegedly racist remark made by the prosecutor in closing argument. We affirm the judgment.

On November 28, 1992, at approximately 9:41 p.m., Officer Pardoe Roberts, who was then with the Lawrence County Sheriff's Department, found the body of Carrie "Tish" Galbreath in a car parked on Luther Bridge Road off State Highway 34 outside of Walnut Ridge. She had been shot six times and died of blood loss. One bullet wound was behind her left ear, and the gun had been fired at close range. She was also shoeless and her feet were covered with mud. Her underwear and pantyhose were found on the floor of the car, and they had a hole through them which was later identified as a bullet hole. What appeared to be blood was found on the outside passenger's side of the car and on the car's hood.

Mills was arrested in connection with the murder and charged with capital murder, rape, and kidnapping. He was later charged with robbery. At the ensuing trial which began on August 1, 1994, and following a motion for directed verdict by the defense, the trial judge dismissed the robbery charge. The jury then returned a guilty verdict for capital murder, and Mills was sentenced to life without parole.

## I. INSUFFICIENT EVIDENCE

The State's case against Mills consisted of these elements. The victim's sister, Peggy Lomax Robbins, testified that she was

---

[1]Mills was charged with premeditated and deliberate capital murder and, alternatively, with capital felony murder. The jury was also instructed on both offenses. The verdict form does not indicate which crime resulted in the conviction. Mills, however, directs his sufficiency-of-the-evidence point at capital felony murder.

with her sister until 6:50 p.m. on the evening of November 28, 1992, and loaned Galbreath her car — a Buick — to go to work. On that same day between 7:00 p.m. and 7:30 p.m., Brenda Whited and her husband, Randal Whited, testified that they were at Coleman's Combo service station in Walnut Ridge buying gasoline for their car. Brenda Whited heard a lady screaming, "He's going to shoot me. Help me, please, he's going to shoot me." She then heard gunshots. She looked back over her shoulder and saw a black male and white female. The woman was screaming and fighting with the man. At that point, the woman screamed, "He's going to shoot me again." She then added, "Oh, God, he's shot me." Brenda Whited saw the man and woman wrestle some more.

Randal Whited then came out of the building. The man yelled to him, "Go get him, across the street, go get him." Randal Whited looked in the direction where the man pointed, but no one was there. The man next shoved the woman into the front seat of their car and down towards the floorboard. As he was driving away, he pulled his car over to where Brenda Whited was parked, pointed at her, and said something which she could not hear. After that, he drove away but Randal Whited took down the license plate of the car which later proved to be the car of Peggy Robbins. At trial, both Brenda Whited and Randal Whited identified Mills as the man with the woman at Coleman's Combo.

It was stipulated at trial that the bullets which killed Carrie Galbreath came from a .38 caliber revolver that belonged to Mills. Lisa Calhoun, a forensic serologist with the State Crime Laboratory, testified at trial that semen was found in the victim's mouth, but none was found in her vagina or rectum. Then Lawrence County Deputy Sheriff Pardoe Roberts testified that blood samples were taken from Mills. DNA testing was performed, and the DNA found in the blood matched the sperm samples taken from Galbreath's mouth. According to Dr. Harold Deadman of the FBI, the probability of selecting someone at random from the black population with the same DNA profile would be one in ten million. When confronted with the DNA results on November 5, 1993, Mills admitted that he had had sex with the victim but said it was Larry White who used his gun to shoot her.

Mike Barter, who was in the Lawrence County jail because

of a drug conviction and fifteen-year sentence, testified that he overheard Mills say that "they had killed this girl and raped her and everything in Walnut Ridge." Robert White, who was incarcerated at the time of trial for burglary and theft, testified that Mills told him that he "and Home Boy raped her [a girl in Walnut Ridge] and killed her." White added that Mills said "they took a gun and shot her five times."[2]

■ In a challenge to the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the State and sustains the judgment of conviction if there is substantial evidence to support it. *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Williams* v. *State*, 298 Ark. 484, 768 S.W.2d 539 (1989). In reviewing the sufficiency of the evidence, we need only consider evidence in support of the conviction. *Id.*

A. Rape

Mills contends that the State failed to prove an element of rape, namely forcible compulsion. *See* Ark. Code Ann. § 5-14-103 (Repl. 1993). He further contends that the evidence supports a finding that the sexual activity between the victim and him was consensual.

In viewing the evidence in the light most favorable to the State, as we must do, the proof of rape in this case is substantial. There is the testimony of Mike Barter and Robert White that they heard Mills admit to raping a girl in Walnut Ridge. There is the eyewitness testimony of the Whiteds, who saw Mills accosting a woman at Coleman's Combo sometime after 7:00 p.m. on the night of Galbreath's murder. There is the DNA profile matching Mills's blood to the semen found in the victim's mouth.

■■ Mills counters this with the fact that according to Dr. Frank Peretti, who performed the autopsy, the victim's facial makeup was intact at the time she was found and the paint on her

---

[2]Both Barter and White were in jail with Mills when they heard these statements. The prosecutor did not allow the fact that Mills was apparently in jail on another offense to come before the jury.

fingernails was not cracked or chipped. Both of these factors, according to Mills, evidenced consensual sex with no force employed by an assailant. We disagree. Clearly, a pistol was involved which could have been used to coerce sex. "Forcible compulsion" is defined as "physical force, express or implied, of death or physical injury to or kidnapping of any person." Ark. Code Ann. § 5-14-101(2) (Repl. 1993). The fact that Galbreath was shot before her underwear and pantyhose were removed circumstantially supports the use of force before sex. Moreover, the time span between the time that Peggy Robbins left her sister's apartment at 6:50 p.m. the night of her murder and the time of her subsequent duress at Coleman's Combo was roughly ten minutes to forty minutes. While not impossible, that abbreviated period undercuts the theory that consensual sex transpired during this window of opportunity. We conclude that the proof of rape was substantial.

B. Kidnapping.

Mills also argues that there was insufficient evidence presented of kidnapping. The heart of his argument is that Galbreath could well have been dead when she was driven from Coleman's Combo; hence, there could be no kidnapping of a deceased person.

There is, first, the fact that the victim's feet were covered with mud suggesting that she had tried to run away from the car later on and, thus, was manifestly alive after the conflict at Coleman's Combo. In addition, although shot at that time according to what the Whiteds heard, there was no proof that Galbreath was dead.

Surely, the testimony of the Whiteds supports a conviction for substantial interference with Galbreath's liberty. Ark. Code Ann. § 5-11-102(a) (Repl. 1993). Furthermore, the fact that Mills's semen was found in the victim's mouth supports a finding of sexual contact with the victim, at a minimum. This evidence *in toto* was also substantial.

C. Capital Murder

Mills next maintains that there was insufficient evidence of capital murder because, other than his uncorroborated confessions to Robert White and Mike Barter, there was no proof

that he fired the fatal shot. Such corroborative proof, however, is not necessary. Ark. Code Ann. § 16-89-111(d) (1987) provides that:

> A confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the offense was committed.

This court has held that the statute requires only proof that the offense was committed by someone in order to corroborate a confession. *See Leshe* v. *State*, 304 Ark. 442, 803 S.W.2d 522 (1991); *Smith* v. *State*, 286 Ark. 247, 691 S.W.2d 154 (1985); *McQueen* v. *State*, 283 Ark. 232, 675 S.W.2d 358 (1984). This requirement for other proof, called the *corpus delicti* requirement, mandates only that a showing be made that the offense occurred and nothing more. *Higgins* v. *State*, 317 Ark. 555, 879 S.W.2d 424 (1994). The State need only prove that Mills confessed and the victim died. as a result of a homicide, which the State did. The evidence was sufficient.

## II. EXCULPATORY EVIDENCE

For his second point, Mills contends that the trial court erred in not granting his motion to declare a mistrial due to the State's failure to reveal the identity of an exculpatory witness. For the first time at trial, Mills's counsel was made aware of the existence of Robbie Batterton, who had seen a black man and white woman riding in a Buick behind a pickup truck on the night of the murder. According to Mills, this was exculpatory because it proved that other people were involved in the crime and supported his theory of the case that Larry White did the shooting.

Under Ark. R. Crim. P. 17.1 (d), the State is required to disclose to the defense any material or information within its knowledge, possession, or control which tends to negate the guilt of the defendant. Ark. R. Crim. P. 19.2 further imposes a continuing duty to disclose this information. *Lewis* v. *State*, 286 Ark. 372, 691 S.W.2d 864 (1985). Under Rule 19.7, if there has been a failure to comply, the trial court may order the undisclosed evidence excluded, grant a continuance, or enter such order as it deems proper under the circumstances. *Id.* In some situations, a recess granted to interview the witness is sufficient to cure the failure to comply with the Rules of Criminal Procedure. *Id.; see*

*Dupree* v. *State*, 271 Ark. 50, 607 S.W.2d 356 (1980); *Hughes* v. *State*, 264 Ark. 723, 574 S.W.2d 888 (1978).

■ The State clearly violated the letter of Rules 17.1(d) and 19.2. However, in ameliorating the situation the trial court followed an appropriate course of action. The court granted time so that the defense could interview Robbie Batterton. Mills then called Batterton to testify as the sole witness in his defense. We fail to see how Mills was prejudiced under these circumstances. *See Davis* v. *State*, 317 Ark. 592, 879 S.W.2d 439 (1994).

### III. PHOTOGRAPHIC LINEUP

Prior to trial, Mills moved to suppress any identification testimony which might be introduced at trial. In his motion, he moved to suppress all testimony concerning both pretrial and in-court identification because the pretrial photographic lineup procedures were highly suggestive and prejudicial to him and any subsequent in-court identification was tainted by the dubious pretrial procedures.

At the ensuing hearing on the motion, Investigator Sam Spades of the Walnut Ridge Police Department testified that two photographic displays were shown to Brenda and Randal Whited. The first photo lineup was conducted on December 7, 1992. Seven pictures were included, but Mills was not one of them. The Whiteds made no identification. Investigator Spades testified that eleven months later on November 9, 1993, a second photo lineup was held and that this time there were eight photographs. The photographs of Mills and Larry White were added, and one photograph used in the previous lineup was removed. The remaining six photographs were the same as those used in the first display. Both of the Whiteds picked Mills from the second photo display.

Because of the duplication of six photographs in the first and second lineups, Mills contends that the integrity of the procedure was highly questionable. He further contends that this is buttressed by the fact that Brenda Whited testified at the hearing that there might have been "one or two" faces in the second photographic lineup which she recalled from the first one.

■■ We will not reverse a trial court's ruling on the admissibility of an in-court identification unless the ruling is clearly

erroneous under the totality of the circumstances. *Milholland* v. *State*, 319 Ark. 604, 893 S.W.2d 327 (1995); *Hayes* v. *State*, 311 Ark. 645, 846 S.W.2d 182 (1993); *Dixon* v. *State*, 310 Ark. 460, 839 S.W.2d 173 (1992). In *Hayes*, we discussed the criteria for assessing whether an in-court identification is suspect or not:

> In determining whether an in-court identification is admissible, the court looks first at whether the pretrial identification procedure was unnecessarily suggestive or otherwise constitutionally suspect. *Van Pelt* v. *State*, 306 Ark. 624, 816 S.W.2d 607 (1991). It is the appellant's burden to show that the pretrial identification procedure was suspect. *Id.*

> Reliability is the linchpin in determining the admissibility of identification testimony. *Dixon* v. *State, supra.* We do not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of irreparable misidentification. *Bishop* v. *State*, 310 Ark. 479, 839 S.W.2d 6 (1992). The following factors are considered in determining reliability: (1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure. *Van Pelt* v. *State, supra; Bowden* v. *State*, 297 Ark. 160, 761 S.W.2d 148 (1988). Even if the technique is impermissibly suggestive, testimony concerning the identification is admissible if the identification is reliable. *Bishop* v. *State, supra.* Finally, the credibility of identification testimony is for the jury to decide. *Dixon* v. *State, supra.*

*Hayes*, 311 Ark. at 648-649, 846 S.W.2d at 183-184.

In applying the factors to the case at hand, Brenda and Randal Whited clearly had the opportunity to view Mills at Coleman's Combo. There was no prior identification of another person by them. They were positive in their choice of Mills at the second photo lineup. And they have never failed to identify Mills in a prior lineup. Almost a full year did pass from the date of the

murder to the date of the second lineup, but that factor in itself does not militate against a reliable identification. The one criterion that is not satisfied is the accuracy of the Whiteds' description of Mills following the altercation at Coleman's Combo. Brenda Whited described the suspect as 5' 10" to 6' tall, black, and possibly with a gold tooth. Randal Whited described him as 6' tall, black, heavy set with a stocky build. Mills is actually only 5' 6" tall and has no gold tooth. In partial answer to this discrepancy, Randal and Brenda Whited testified that they only were able to see Mills from the chest up because his car obstructed their view.

Viewing the totality of the circumstances surrounding the photographic lineup and the in-court identification, we cannot say that the trial court clearly erred in permitting the in-court identification to proceed. We have held that a judgment of conviction will only be set aside when the photographic lineup is so suggestive and unreliable as to create a substantial possibility of misidentification. *Goins* v. *State*, 318 Ark. 689, 890 S.W.2d 602 (1995). The Whiteds never wavered in their certainty that Mills was the man they saw at Coleman's Combo, and other than a mistaken estimate of four inches in height, there is nothing that diminishes the reliability of their identification. We affirm the trial court on this point.

## IV. BLOOD TEST

Mills next contends that blood was improperly seized from him without a court order in violation of our Rules of Criminal Procedure, and that, as a consequence, the DNA results tying him to the sperm found in the victim's mouth should have been suppressed. The basis for this argument is Ark. R. Crim. P. 18.1(a)(vii) which reads:

> (a) Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the defendant to:
>
> . . . .
>
> (vii) permit the taking of samples of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof; . . . .

■ The taking of blood by a law enforcement officer does amount to a Fourth Amendment search and seizure. *Schmerber* v. *California*, 384 U.S. 757 (1965); *see also, Turner* v. *State*, 258 Ark. 425, 527 S.W.2d 580 (1975); *Walker* v. *State*, 244 Ark. 1150, 429 S.W.2d 121 (1968). A consensual search, however, does not run afoul of the Fourth Amendment. *Chism* v. *State*, 312 Ark. 559, 853 S.W.2d 255 (1993); *Moore* v. *State*, 304 Ark. 257, 801 S.W.2d 638 (1990). We further conclude that a consensual taking of blood also does not contravene Rule 18.1(a)(vii) because the rule does not require a court order when the drawing of blood is voluntary. The question then is whether Mills agreed to the taking of his blood.

■ This court reviews the evidence in the light most favorable to the State and considers the totality of the circumstances in determining whether the State proved that consent to a search was freely and voluntarily given without actual or implied coercion. *Chism* v. *State, supra; Duncan* v. *State*, 304 Ark. 311, 802 S.W.2d 917 (1991). We will affirm a finding of voluntariness unless that finding is clearly against the preponderance of the evidence. *Chism* v. *State, supra.*

Pardoe Roberts, a deputy sheriff at the time, testified that when he served Mills with the State's petition to seek an order requiring a DNA test, Mills informed him that the petition was not necessary because he would voluntarily submit to the blood test. Deputy Sheriff Roberts then asked the prosecuting attorney what the proper procedure in this situation was, and he was told that if Mills wanted to voluntarily consent to the blood test, then he should be taken to the hospital to have one conducted. Roberts testified that, following that advice, he took Mills to the Lawrence County Memorial Hospital where the blood work was completed. Brenda Jones, the laboratory supervisor at the hospital, testified that she drew Mills's blood for the DNA testing. She testified that he never objected to his blood being taken; nor did he refuse to have the blood drawn. She stated that had Mills refused the blood work, no blood would have been drawn. No consent form was executed.

Mills, on the other hand, testified that he had previously refused to submit to a blood test. He said that Deputy Sheriff Roberts approached him and asked if he wanted to give blood and that he told him "No." He then testified that the deputy sher-

iff came back with a piece of paper and told him that he had a court order, requiring Mills to take the blood test.

██ ██ Faced with the two versions of what transpired, the trial court made a credibility decision of which witness to believe. The credibility of the witnesses in this instance was for the trial court to weigh and assess. *Johnson* v. *State*, 321 Ark. 117, 900 S.W.2d 940 (1995). We cannot say that the trial court was in error in finding the rendition of Deputy Sheriff Roberts and Brenda Jones more believable than that of Mills.

## V. REFRESHING RECOLLECTION BY HYPNOSIS

During cross-examination, defense counsel sought to refresh the recollection of the victim's sister, Peggy Lomax Robbins, by using her statements made under hypnosis. Defense counsel asked Robbins whether, while under hypnosis, she recalled telling the doctor "they shot her." Robbins answered that she remembered nothing about that. Defense counsel then stated that he wanted to show her a transcript of the hypnotherapy session to which the prosecutor objected, and the trial court sustained the objection. Defense counsel next attempted to play a tape of the hypnotherapy session, an objection was again made by the State, and it too was sustained by the trial court. Defense counsel then proffered the tape for the record. Later on in the trial, there was some confusion between the trial court and defense counsel over whether defense counsel had attempted to refresh Robbins's recollection with an actual transcript of the hypnotherapy session or police notes. Whatever the case, no transcript of the session was proffered for the record, and it is not available for our review.

This is an issue of first impression in this state. What defense counsel attempted to do with this witness was use her to introduce the transcript of her hypnosis where she allegedly said "they shot her" rather than "he shot her." The psychologist for the hypnotherapy session, Dr. Gaylon Hurst, was not called to lay a foundation for admissibility. The tape or transcript would have been evidence of statements made by the witness while under hypnosis which she did not recall making. This situation is different from when a defendant or witness is called to give hypnotically refreshed testimony. *See, e.g., Rock* v. *Arkansas*, 483 U.S. 44 (1987); *Partin* v. *State*, 318 Ark. 312, 885 S.W.2d 21 (1994). Mills presents us with no authority for why statements of a wit-

ness made under hypnosis should be relevant, reliable, or otherwise admissible. *See Dixon* v. *State*, 260 Ark. 857, 545 S.W.2d 606 (1977). Moreover, defense counsel's efforts in this regard do not resemble a typical attempt to refresh recollection under Ark. R. Evid. 612 by previous writing or other object. Here, the statements allegedly made by Robbins were not recalled by her and were presumably made while she was in a hypnotic trance.

 Rulings on the admissibility of evidence are matters within the trial court's sound discretion, and we will not reverse these evidentiary rulings absent an abuse of that discretion. *Partin* v. *State, supra; Utley* v. *State*, 308 Ark. 622, 826 S.W.2d 268 (1992). Though the State is wrong in its brief in asserting that the tape of the session was not proffered, we view this of no great moment. We find no abuse of discretion in the trial court's disallowing the use of Robbins's statements made under hypnosis to expand her testimony.

## VI. DEMONSTRATIVE EVIDENCE

The next issue surrounds the State's use of demonstrative or illustrative evidence — a photograph of a Ford pickup truck — used for comparison purposes with the photograph of a Peacock company pickup truck previously introduced through a State witness. The witness on the stand was Robbie Batterton, who had been called as the sole defense witness to testify about seeing a black man and white woman in a light-colored Buick "tailgating" a pickup truck. Batterton testified that the pickup truck he saw did not look like the Peacock truck, which Larry White drove and which was depicted in a photograph shown to him by defense counsel. He did testify that the vehicle he saw looked like the photograph of the Ford pickup truck shown him by the State, although he believed the pickup truck he saw was actually a GMC or Chevrolet truck. The picture of the Ford pickup truck was introduced to show that it was significantly different from the Peacock truck. Defense counsel objected to the State's photograph, but the trial court overruled the objection.

 The admissibility of demonstrative evidence is a matter falling within the wide discretion of the trial court. *Garrison* v. *State*, 319 Ark. 617, 893 S.W.2d 763 (1995); *Bowden* v. *State*, 297 Ark. 160, 761 S.W.2d 148 (1988). Here, there is no basis for a conclusion that the trial court abused that discretion.

## VII. CLOSING ARGUMENT

Mills's last point is that the trial court erred in overruling his objection to a remark made by the prosecutor in closing argument. The statements in question were made during the prosecutor's rebuttal argument:

> And you remember what the officers told you why we had some of the same folks in the lineup? Because we just don't have that many black people here. And you know something else that you know as well as I do? Our black community, I'm talking about our local black families who've been here forever, are very law abiding people.

Defense counsel made the following objection: "I object, that's a racist statement on behalf of the state and I object to it, to talk about we have good blacks here as opposed to bad blacks." Defense counsel failed, however, to ask for any specific relief from the trial court. The State responded, "How is that racist? That's why we don't have them in the lineup." The court overruled the objection, and the State continued its closing argument. Defense counsel requested no admonition or curative instruction from the court, and none was given.

 We have held that the trial court is given broad discretion to control counsel in closing arguments, and this court does not interfere with that discretion absent a manifest abuse of it. *Wetherington* v. *State*, 319 Ark. 37, 889 S.W.2d 34 (1995); *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). Indeed, remarks made during closing arguments that require reversal are rare and require an appeal to the jurors' passions. *Wetherington* v. *State, supra; Neff* v. *State*, 287 Ark. 88, 696 S.W.2d 736 (1985). It does not appear that any such appeal for an emotional or passionate response was made in this case. Further, it is difficult to fathom how the prosecutor's remarks in any way prejudiced Mills's case. And, lastly, defense counsel made no request for relief following his objection. There was no error by the trial court in overruling the objection.

The record of the trial has been reviewed in this case pursuant to Supreme Court Rule 4-3(h), and no reversible error has been found.

Affirmed.