Georgia Louise WEAVER *v.* STATE of Arkansas

CR 95-1205                                             920 S.W.2d 491

Supreme Court of Arkansas
Opinion delivered April 29, 1996

*William R. Simpson, Jr.*, Public Defender and *Llewellyn J. Marczuk* Deputy Public Defender, by: *C. Joseph Cordi, Jr.*, Deputy Public Defender.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Georgia Louise Weaver appeals her capital murder conviction for the murder of her sister, Jeannie Allen, and her first-degree battery conviction regarding her great-niece, Theresa Allen Tessman. Weaver raises four points on

appeal concerning sufficiency of the evidence and trial error. We hold that the evidence supporting conviction was substantial and that there was no reversible error. Accordingly, we affirm.

The victim in this case — Jennie Lee Allen, who went by Jeannie Allen — was age 66 at the time of her death. On December 19, 1992, she was admitted to Baptist Medical Center in Little Rock with fever, nausea, vomiting, diarrhea, near unconsciousness, weakness, and blurred vision. Her symptoms suggested a gastro-intestinal illness. Neurological problems developed, and she was placed on a ventilator. Heavy metal screening and urine sampling revealed high levels of arsenic poisoning — 1,237 micrograms of arsenic as compared to an acceptable range of less than 200 micro-grams. Treatment for arsenic poisoning was not implemented in time, and she died of cardiac arrest on January 17, 1993.

Following Jeannie Allen's demise, members of her family were tested for arsenic poisoning. Her granddaughter, Theresa Allen, who was age 24, had an elevated microgram level of arsenic of 1,024, which was about five times above the acceptable level. It was also discovered that Theresa Allen was seven weeks pregnant. Because of the risk of fetal damage caused by arsenic poisoning, she voluntarily terminated her pregnancy. She was hospitalized for arse-nic treatment for four days — from January 30, 1993, to February 2, 1993.

The death of Jeannie Allen and the arsenic poisoning of The-resa Allen led to charges of capital murder and first-degree battery against Weaver. The State's theory of the case was that Weaver, motivated by greed and revenge, poisoned her sister by placing arsenic in her food, drink, and medication. Following a jury trial and verdict of guilty, Weaver was sentenced to life without parole for murder and to thirty years imprisonment for first-degree battery.

## I. Sufficiency of the Evidence

For her first issue, Weaver contends that the trial court erred in refusing to direct a verdict in her favor based on insufficient evi-dence against her. She urges that this was a case of circumstantial evidence and that another reasonable hypothesis existed for who murdered Jeannie Allen. The hypothesis she posits is that Jimmie Allen, Jeannie Allen's husband, murdered his wife because (1) he had the opportunity to do so; (2) he tested negative for arsenic poisoning himself; and (3) he had threatened to kill Weaver and

complained about her efforts to move into his house. We do not agree that Weaver's hypothesis is reasonable.

A motion for directed verdict is a challenge to the sufficiency of the evidence. *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). In determining the sufficiency of the evidence, we review the evidence in the light most favorable to the State and sustain the judgment of conviction if there is substantial evidence to support it. *Mills* v. *State*, 322 Ark. 647, 910 S.W.2d 682 (1995). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* Only the evidence supporting the conviction need be considered. *Id.* In order for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. *Walker* v. *State*, 324 Ark. 106, 918 S.W.2d 172 (1996); *Nance* v. *State*, 323 Ark. 583, 918 S.W.2d 114 (1996). Such a determination is a question of fact for the fact finder to determine. *Huggins* v. *State*, 322 Ark. 70, 907 S.W.2d 697 (1995); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993).

A person is guilty of capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person." Ark. Code Ann. § 5-10-101 (a)(4) (Repl. 1993 & Supp. 1995). We have held that premeditation and deliberation may be inferred from circumstantial evidence. *Shaw* v. *State*, 299 Ark. 474, 773 S.W.2d 827 (1989). We have further emphasized that intent and state of mind are rarely capable of proof by direct evidence and must usually be inferred from the circumstances of the case. *Davis* v. *State*, 317 Ark. 592, 879 S.W.2d 439 (1994).

Contrary to Weaver's assertions, there was testimony to show that it was not reasonable to hypothecate that Jimmie Allen poisoned his wife and granddaughter. First, there was no testimony that he ever prepared meals for them. Secondly, he did not eat the same food as his wife and granddaughter which made his negative testing for arsenic not surprising. His children testified that his diet was restricted to baloney sandwiches and sandwiches from various fast food restaurants. They also testified that he drank only tap water or canned beverages. Witnesses further stated that he had limited ambulatory ability and a deteriorating mental condition. And he was never connected at trial in any way to arsenic. Finally, Weaver, the subject of Jimmie Allen's malevolence, was not poisoned — his

wife was. In sum, Weaver's theory of the case was clearly a matter for the jury to weigh and resolve, and the jury rejected Weaver's hypothesis, no doubt because it was implausible.

The circumstantial evidence supporting the jury verdict follows. Gary Lawrence, a chemist with the State Crime Laboratory, testified that the medication, Vick's Nyquil, taken from the decedent's home and a fruit punch taken from her freezer both tested positive for arsenic. Other testimony established a motive for murder. According to Jerry Allen, the son of the deceased, the sisters, Jeannie Allen and Georgia Weaver, became estranged in 1990, due to a dispute over funds of the guardianship estate of their mother, Birdie Fewell. Jeanette "Rusty" Rohlman, a neighbor of Jeannie and Jimmie Allen, testified that she had been close friends with the Allens since 1981. She was also knowledgeable about the dispute between the sisters over funds of the Birdie Fewell guardianship. Rohlman stated that Weaver wanted to divide the proceeds between them while Jeannie Allen wanted to put the money in an account for their mother. The dispute blossomed into a lawsuit filed by Allen against Weaver over missing funds, and Weaver afterwards vowed revenge. The estrangement ended in May or June of 1992, according to Jerry Allen, when Jeannie Allen assisted Weaver in resolving some "trouble with the law." Jerry Allen also testified that after the apparent reconciliation, it seemed as if Weaver was trying to take over every aspect of Allen's life and business. Rohlman testified that the dispute over the guardianship funds was still in litigation as late as November or December of 1992.

Rohlman added that she observed Weaver and Jeannie Allen spending nearly every day together during the summer of 1992. She testified that she had a key to Allen's home but that the locks were changed in the fall of 1992. In October of 1992, Allen brought her the keys to her freezer, where her cash was kept, and to her top dresser drawer, where her jewelry was stored, for Rohlman to keep. Rohlman further told the jury that Jeannie Allen received a J.C. Penney's bill on an account which she no longer had at the store and that an expensive ring had been charged to that account. On December 16, 1992, she accompanied Allen to J.C. Penney's to resolve the charge on the credit card. When they returned, Weaver was not there but arrived shortly afterwards. Rohlman testified:

> Georgia came into the house, and she said, "I have all my stuff in the car. What should I do with it? Where can I

put it?" Georgia said— Jean told Georgia, "I told you not to bring anything over here. You are not moving in. You're not putting it anywhere. Leave it in the car. You have a place to live."

About thirty minutes later, Allen went to the bathroom and became violently ill. According to Rohlman, she blamed the illness on her "nerves" from Weaver "driving [her] crazy." Rohlman added that Weaver did not seem concerned about Jeannie Allen's illness.

Barbara Conneely, the daughter of Jimmie and Jeannie Allen, who lived in Chicago in 1992, and Nora Swain, another neighbor, confirmed that Weaver was always at Allen's home during the summer and fall of 1992 and that she was reluctant to let them speak to Allen on the telephone. Viola Lenard, another neighbor, testified that Weaver was always around the victim and that it affected her relationship with others. Lenard further stated that Weaver had "seen to" Allen's turning everything over to her in her will.

Marian White, the owner of the Cimarron Inn in Little Rock, testified that she found a bottle of rat poison at her inn where Weaver had worked as a desk clerk, beginning on December 11, 1992, and terminating on January 10, 1993. White testified that Weaver showed her where she hid her sister's purse in a linen storage room at the inn because she did not want the police to find it. Ultimately, the purse disappeared. On March 2, 1993, White found a bottle of rat poison hidden between a blanket and bedspread in the storage area adjacent to the linen storage room. According to White, that type of rat poison was never used at the inn. Danny Naegle, the manager of Farmer's Association, testified that the price sticker on the bottle of liquid rat poison showed that it was sold at his store. The bottle was placed on his store shelf in October of 1992, and, Naegle stated, it was unlikely that the bottle was purchased after December of 1992 due to the manner in which the item was stocked, coupled with the number of sales during those months. Gary Lawrence of the State Crime Laboratory confirmed the presence of arsenic in a sample taken from the rat poison.

Officer Wilbur Page of the Little Rock Police Department introduced a power of attorney purportedly signed by "Jennie Allen" and a Discover card under the name of James S. Allen. These

items were recovered from Weaver. Linda Taylor, a handwriting expert, stated that in her opinion Weaver forged Allen's signature on the power of attorney dated November 16, 1992. Jim Kirkland, a bank branch manager who notarized the power of attorney, testified that he notarizes documents only after verifying the signature on photo identification.

Linda Smith, who at the time worked in fine jewelry at J.C. Penney's, testified that she sold a diamond ring to Weaver on November 19, 1992, at a cost of about $3,000. The ring was purchased on a temporary J.C. Penney's charge card issued in the name of "Jennie Allen," her legal name. Suzanne Stephens, who also works for J.C. Penney's, testified that Weaver approached her about getting a temporary credit card, and she identified herself as Jennie Allen. According to Stephens, Weaver presented an Arkansas driver's license with Allen's name and Weaver's picture. She further testified that Weaver presented her with documents giving Allen guardianship over James Allen's account and properties. Based on this information, Stephens reactivated Allen's account. Gary Aldrich, a retired pawn broker, testified that on November 19, 1992, Weaver pawned a diamond ring for $400.

Brenda Rockins, a postal employee, testified that Weaver rented a post office box under the name of Jennie L. Allen. The application was dated November 30, 1992. Weaver also filed a change of address in her name to the same post office box that was registered to Allen. Both change-of-address documents were dated December 21, 1992.

Jamie Teague, the branch manager for First Commercial Bank, testified that Weaver presented her with a power of attorney executed by Jeannie Allen in favor of Weaver for purposes of cashing a check in the amount of $1,392.89. That withdrawal closed out the account, which belonged to Birdie Fewell, the sisters' mother. Weaver used the power of attorney to gain access to Allen's safety deposit box, but the box was empty.

Theresa Allen told the jury that she ate lunch every day with her grandmother, Jeannie Allen, because she worked nearby. Theresa testified that "[i]t was pretty plain to see that [Weaver] was taking over the house little by little." Theresa testified that toward the end of the summer, Weaver was fixing lunch for her every day. Theresa Allen told the jury about how upset Jeannie Allen was

when she learned that she had been charged $3,000 on the J.C. Penney's account. Theresa also testified that Weaver would pick up the Allens' mail and added that she quit seeing Weaver at the Allen house after the episode concerning the J.C. Penney's bill.

Theresa further testified that she started feeling poorly approximately two weeks before her grandmother's death and that she tested positive for arsenic poisoning. She was admitted to the Baptist Medical Center for four days and then received seven more days of treatment at home. Prior to the arsenic testing, Theresa Allen blamed her illness on the fact that she was pregnant. She then had an abortion because the arsenic poisoning had penetrated her placenta, and she concluded that the baby would not have been normal. She stated that she once borrowed some Vick's Nyquil from her grandmother, used it, and later returned the bottle.

Finally, Theresa Allen stated that Weaver once asked her where she could obtain a fake driver's license for her son and his girlfriend, who needed the fake ID's so that they could go out. Theresa told Weaver how she obtained her fake ID. Theresa added that she drank for months from the beverage container which was contaminated with arsenic.

To summarize the testimony, Weaver and her sister fell out over money, and Weaver vowed revenge. During the summer and fall of 1992, Weaver appeared to be taking over Jeannie Allen's affairs and isolating her. She forged her sister's name on a power of attorney, apparently by obtaining a fake driver's license which bore her sister's name. She later used these items to empty the Birdie Fewell bank account (about $1,400) and to view Jeannie Allen's safety deposit box. She also began a scheme of impersonation. On November 19, 1992, Weaver used her false identification to reopen Allen's account at J.C. Penney's and purchase a $3,000 diamond ring, which she later pawned for $400. Jeannie Allen received the J.C. Penney's bill in December of 1992 and began taking steps to find out what had happened. Shortly after this occurred, Allen became violently ill.

Both the Vick's Nyquil bottle and the gallon drink container found in the Allen home tested positive for arsenic. On March 2, 1993, liquid rat poison containing arsenic was found hidden in the storage room at Weaver's former place of employment next to a linen storage area where she had hidden her sister's purse because

she did not want the police to find it. Theresa Allen was also poisoned, and she testified that Weaver prepared meals for her on a daily basis.

■ This evidence was sufficient to compel a reasonable mind to conclude that Weaver poisoned her sister and grand-niece. The testimony showed that Weaver was motivated by revenge and greed against her sister. There was ample evidence that she had developed a full-blown scheme to take over her sister's property and affairs. She also had the opportunity and the means to commit murder because she had access to food, drink, and medication in the Allen household. And finally there was the link to the rat poison at her place of employment. The trial court did not err in denying the motion for directed verdict.

## II. First-Degree Battery

Weaver next contends that there was insufficient evidence supporting her first-degree battery conviction. Our analysis of this point turns on the definition of "serious physical injury." A person commits battery in the first degree if "[h]e causes serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-13-201 (a)(3) (Repl. 1993 & Supp. 1995). The code defines "serious physical injury" as "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102 (19) (Repl. 1993 & Supp. 1995). We look to determine whether there is substantial evidence from which the jury might infer serious physical injury. *See Purifoy v. State*, 307 Ark. 482, 822 S.W.2d 374 (1991); *Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990).

■ In viewing the circumstances surrounding the poisoning and its impact on Theresa Allen, we conclude that there is substantial evidence to support a verdict that her injury was "serious." It is apparent to us that there was a substantial risk of death. This inference is supported by the convincing fact that the elevated level of arsenic in her system approached the lethal level found in Jeannie Allen. She was also hospitalized for several days to reduce the level of toxicity. Again, the trial court did not err in denying the directed verdict motion on this charge.

### III. Mistrial

Weaver moved for a mistrial during Jerry Allen's testimony. He stated in answer to the prosecutor's question that in May or June of 1992, Weaver "was in some type of trouble with the law, and [Jeannie Allen] intended to help her." Counsel for Weaver objected to the testimony and moved for a mistrial. The State argued that the impact was minimal and that an admonition would suffice to cure any damage. The court denied the motion to declare a mistrial, and Weaver declined the offer of an admonition. Weaver argues that justice could not have been served by continuing the trial and that the motion should have been granted because the jury likely presumed her to be a career criminal.

A mistrial is a drastic remedy and is proper only when the error is beyond repair and cannot be corrected by any curative relief. *Goins v. State*, 318 Ark. 689, 890 S.W.2d 602 (1995). The granting of a mistrial is within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a showing of abuse. *Bradley v. State*, 320 Ark. 100, 896 S.W.2d 425 (1995). It is not an abuse of discretion if improper comment did not influence the verdict. *Id.* When there is doubt as to whether the trial court abused its discretion, a failure to request an admonition will negate a mistrial motion. *Boyd v. State*, 318 Ark. 799, 889 S.W.2d 20 (1994).

Weaver relies on *Allard v. State*, 283 Ark. 317, 675 S.W.2d 829 (1984), as authority for when a declaration of a mistrial is warranted. That case, however, is factually distinguishable. In *Allard*, additional counts of theft by receiving contained in the original indictment were read to the jury even though the defendant was to be tried only for aggravated robbery. Under such circumstances, the prejudice to the defendant was real and palpable.

Here, from the context of the colloquy, the testimony was not deliberately solicited by the prosecutor. Prior to the testimony, the prosecutor told the trial court and defense counsel that he had instructed Jerry Allen not to state what Weaver's problems with the law were. The prosecutor then asked what Jeannie Allen's intended course of conduct was, and Jerry Allen made the reference to "trouble with the law." In addition, we observe that there was no specific reference to a particular crime. As the trial court remarked, the "trouble with the law" referred to by Jerry Allen could have

been traffic violations and relatively minor indeed. Bolstering this conclusion is the fact that the jury could have inferred that any "trouble with the law" was not serious in 1992, because Weaver did not go to jail but spent nearly every day with Jeannie Allen from that point forward until her death. We have held in the past that an admonition to the jury could cure a witness's reference to the defendant's "previous record" or third-degree battery conviction. *See Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994); *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991).

■ Because the possibility of prejudice was speculative, an admonition could have cured any potential error. An admonition was offered, and counsel for Weaver declined. The trial court did not abuse its discretion in denying the motion for a mistrial. *See Heard v. State*, 322 Ark. 553, 910 S.W.2d 663 (1995).

### IV. Admissibility of Rat Poison

■ Weaver moved to suppress the bottle of rat poison found hidden in a storage area at the Cimarron Inn seven weeks after the crime on the basis that it was irrelevant. She now appeals the trial court's ruling on her motion. Evidence is relevant, under our rule and caselaw, if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable. Ark. R. Evid. 401; *Walker v. State*, 301 Ark. 218, 783 S.W.2d 44 (1990). The trial court has wide discretion on rulings concerning the admissibility of evidence, and that decision will not be reversed absent an abuse of discretion. *Monk v. State*, 320 Ark. 189, 895 S.W.2d 904 (1995); *Grigsby v. State*, 260 Ark. 499, 542 S.W.2d 275 (1976).

■ The evidence, to reiterate, was that rat poison was found at the Cimarron Inn, Weaver's former place of employment, close to an area where she had once hidden her sister's purse. Weaver worked at the inn from December 11, 1992, to January 10, 1993. Allen was hospitalized on December 19, 1992. The discovered rat poison contained arsenic. The poison was not found where other chemicals were stored by the inn and was unlike other poison used by the inn to control rats and mice. It was also shown that the poison was purchased near the time when Jeannie Allen began exhibiting symptoms of arsenic poisoning. The evidence, *in toto*, supports an inference that Weaver purchased the poison, used it to murder Allen, and hid it at her place of employment. The trial

court did not abuse its discretion in admitting the bottle of rat poison into evidence for the jury to weigh. *See Miller* v. *State*, 280 Ark. 551, 660 S.W.2d 163 (1983).

The record in this case has been reviewed for other reversible error in accordance with Supreme Court Rule 4-3(h), and none has been found.

Affirmed.