Andrew J. LIMBER, Jr. and Darlene Ann
Warburton LIMBER *v.* STATE of Arkansas

CR 78-103                                  572 S.W. 2d 402

Opinion delivered October 30, 1978
(Division II)

*Bill Webster* and *Frank Lady,* for appellants.

*Bill Clinton,* Atty. Gen., by: *Ray Hartenstein,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Andrew J. Limber, Jr. and Darlene Ann Warburton Limber were jointly charged and tried for the second degree murder of Michael Brad Warburton, the nineteen month old male child of Mrs. Limber. An amended information charged each as an accomplice of the other, responsible for the other's actions whether committed in the presence or absence of the other. Their cases were tried to a Craighead County jury and he was found guilty of second degree murder, and she was found guilty of manslaughter; he was sentenced to twenty years and she was

sentenced to five years in the Arkansas Department of Correction. They have both appealed their convictions alleging numerous errors. However, we find no error requiring reversal of their convictions.

The State presented thirteen witnesses in this trial and each defendant took the witness stand. In addition, Limber called one character witness.

Essentially the State's charge and proof was that the child died as a result of child abuse caused by the two appellants, acting together, or separately, but both responsible for the abuse. The defendants explained that any injuries the minor child suffered were caused by accidents and not as a result of intentional abuse. Certain injuries could not be explained by them.

Limber and Mrs. Limber lived together for a period of seven or eight months before the child died on April 21, 1976. They were not married until after charges were filed in this case. She has one other minor child, Christian, about three years old. During the period of time in question they lived in two places, Paragould and Jonesboro.

Several witnesses testified that prior to Brad's death they had observed bruises on his face and a bandaged leg. Limber's sister, Ollie Decker, testified that on several occasions she noticed that Brad was bruised or injured. About two months before his death, he had bruises on his face which covered the side of his face, and he appeared to be in quite a bit of pain. She was told that he had fallen off a tricycle. About six weeks before his death, he was bruised around his waist; she was told by Mrs. Limber that he had fallen off the bed or something. About two or three weeks before his death, he had a bandage from the ankle to above his knee. The old bruises still showed; he appeared to be in pain and didn't want anyone to touch him.

John Westmoreland, an investigator for the Arkansas State Police, testified that a few hours after Brad's death he viewed the body in the morgue and there were numerous injuries on the body. He stated there were blue bruises on the

face, forehead, side of the neck, arms, legs and hands and what appeared to be cigarette burns on the right side of the forehead and neck. He also stated that there were cuts on the forehead and under the chin; that the end of the penis and the scrotum were blue and bruised; that there was a red, inflamed area encircling the base of the penis. He described the stomach as scratched, swollen and tight like a balloon. Photographs graphically corroborated the testimony of the investigator.

Westmoreland also testified that Mrs. Limber gave several statements during four interviews. Since this was a joint trial, any reference to Limber was stricken from the statement. In the first interview she stated that she had seen another person hit Brad on the mouth causing it to bleed; and, that in her opinion, Christian had been hit too hard on the buttocks. In the second interview, she stated that Brad had been spanked too hard; that the spankings gradually got worse; and that the spankings were done by another person for discipline purposes relative to potty training. She explained that Brad's penis was cut when he was jerked off of a potty seat. She said that Brad's hands had been bruised when Christian ran over them with a tricycle, and that he received scratches on the neck, a cut on the head, and a bump on the forehead in a car accident on April 17th. She stated that on April 20th, the day before he died, he fell off a hobby horse and cut his chin, and also fell off the bed. She also observed another person kick him between the rectum and testicles.

She had no explanation for the internal and external stomach injuries, nor for bruises along the spine, on the back of his head and legs. Neither did she explain why she allowed this to go on, nor why she failed to take preventive measures.

Another investigator for the Arkansas State Police, David Davidson, interviewed Limber the day Brad died. He testified that Limber explained that the child had been in five minor accidents and any injuries he suffered were as a result of the accidents. On April 17th, Limber suddenly stopped the car, and Brad fell from the back seat into the floor where an entrenching tool and some pop bottles were laying. A day or two later Brad fell into the floor of a car that Limber's father

was driving when he made a sudden turn. The bruises on the hands were caused when Christian ran over them with his tricycle about a week before the child's death. On April 20th, Brad cut his chin when he fell off a toy horse; and, he hit the back of his head when he fell off the bed.

Davidson said Limber stated that he didn't know how Brad's leg was injured; that Limber offered no explanation for certain injuries on the child's legs, arms, genital area, and internal organs. Limber did admit that he spanked both children with his hands, and that he spanked Brad about once a week on the buttocks leaving a bruised impression of his four fingers because Brad was wetting the bed every other night. He also admitted that he had a "good temper if someone walked on him", and that he and Mrs. Limber fussed about the children.

A doctor, who was qualified as an expert witness in the field of forensic pathology, testified that this was a classic case of child abuse. He testified that no part of the body was uninjured, and described "innumerable" injuries in great detail. Bruises over the spine created a "line of damage", and were especially obvious; these bruises were of varying ages. There was a cut on the chin less than a week old which should have been sutured but wasn't. There were several abrasions on the face, and the hands were "remarkedly altered by bruises especially over the extensor surfaces" and palms. There were extensive fractures of the ribs on both the right and left sides, which occurred three weeks to 120 days prior to death. Although the doctor could not state positively that the fractures occurred at different times, he said there was evidence to that effect. The injury that fractured the right ribs also caused fibrous scarring of the covering of the liver which adhered to the abdominal wall.

The doctor also described other injuries which he characterized as unusual: a lesion on the neck which had the appearance of a cigarette burn; a constricting lesion around the base of the penis, and cuts and bruises on the head of the penis; and two "very major contusions" on the head which were sustained approximately one to two weeks before death. An autopsy revealed massive hematomas in the scalp; he

described these injuries as potentially fatal. (The doctor testified that there were more than twenty head injuries, including these two.)

The doctor stated, however, that the most significant injuries, in addition to the potentially fatal head injuries, were those to the abdomen. He testified that approximately one and one-half to three weeks prior to death the small intestine had been lacerated by a powerful, blunt trauma, and that the force necessary to cause such an injury was comparable to a "blow of a fist or something like that from a powerful adult, or a shoe." This injury also damaged the left adrenal gland and the pancreas. He further testified that the stomach would begin to swell within a day or two of such an injury, and was associated with severe pain, somewhat like that induced by an untreated gunshot wound. He also noted that this injury and the injury which caused the fractured ribs did not occur at the same time.

The doctor said that although the immediate cause of the child's death was peritonitis and sepsis caused by a ruptured intestine, it was his diagnosis that all the innumerable injuries were due to numerous and multiple episodes where the child was beaten. In answer to a hypothetical question by the prosecuting attorney, the doctor stated that even if the child were involved in the several accidents described by the defendants, those accidents would not have caused all the injuries.

Evidence was admitted that the other child, Christian, had both arms broken in an incident that occurred in the home on or about the 22nd day of November, 1975. There was a slight conflict in the testimony regarding how this incident or accident occurred. One witness, however, testified that he had been told by Limber that the child had been pulled between the parties, Limber and Mrs. Limber, in an argument about putting the child to bed.

A Service Specialist for Arkansas Social Services testified that as a result of this incident a "protective service case" was opened by Social Services. During her investigation of the incident, both defendants told her that Christian's arms were broken while Limber was playing with him.

Mrs. Limber's testimony regarding Christian was that she and Limber were sitting on the couch about midnight, and she told him he should take Christian to the bathroom. He went into the bedroom and brought Christian out; she met them, took Christian from Limber and told him that she would do it. Limber took him back and said he would do it. Limber took him to the bathroom and put him back to bed. A short time later, she heard Christian crying and whimpering. She then checked on him and noticed red marks and swelling on his arms. Ice packs were applied to his arms and around 4:00 a.m. she took him to the emergency room.

She said Limber told her that Christian's arms must have been broken when he pulled him across the bed and picked him up by his arms. In any event, it was not disputed that the child's arms were, in fact, broken.

Both appellants testified extensively in their defense. Limber explained that Brad had been involved in five minor accidents and any injuries he suffered were a result of these accidents. In one instance the child's brother, Christian, had run over Brad's hands; in another instance he had fallen off the bed; in another, he had fallen off a hobby horse; and, on two occasions, he had fallen into the floor of a vehicle which had come to a sudden stop. Limber admitted that he. had whipped the child perhaps at least once a week in an effort to potty train him; that he had disciplined the child with his hand, but never to excess. In general, he denied abusing the child.

On cross examination, he testified that he didn't "know where these pictures (State's Exhibits Nos. 1-4) came from, but he (Brad) didn't look like that" on the day he died. He also stated that on the day before, April 20th, Brad's stomach was flat and that Brad was acting normal: playing, laughing, smiling and having a good time.

Mrs. Limber denied that she had abused the child but admitted that they had argued about Limber's disciplining the children and whipping Brad. She also stated that on one occasion, after one of their serious arguments, Andrew said that he wondered how it would be without the children.

Both parties admitted that Limber had beaten Mrs. Limber to the extent that medical attention was required.

Limber argues on appeal that the court was in error in not requiring the State to file a Bill of Particulars and contends that, under Ark. Stat. Ann. § 43-804 and § 43-1006 (Repl. 1977), it is mandatory that a Bill of Particulars be filed upon request by the defendant. We find no merit in this argument. In a hearing before the trial judge, the prosecuting attorney stated that he intended to proceed against both parties on a classic case of child abuse which occurred over a period of time according to statements and other evidence he had in his file. He turned the complete file over to the defense attorneys, which consisted of about ninety pages, and said that was going to be his case. This file included a statement from the pathologist within the autopsy report which indicated that the cause of death was child abuse. The State's case did not substantially vary from the evidence in the file, which was a part of the record abstracted.

We know of nothing more that the prosecuting attorney really could have done. The parties were charged by the language in the statute, Ark. Stat. Ann. § 41-1503 (Repl. 1977). It may be that the prosecutor could have technically amended the charge to allege that over a period of time they abused the child physically; but we know of no other way it could have been said in such detail that would have provided the defense with as much information as they were given by having a complete discovery.

The purpose of a Bill of Particulars is to acquaint the defense with sufficient information so that a defense can be prepared. Ark. Stat. Ann. § 43-804 (Repl. 1977); *Edens* v. *State*, 235 Ark. 996, 363 S.W. 2d 923 (1963). The court has some discretion in the matter. *Silas* v. *State*, 232 Ark. 248, 337 S.W. 2d 644 (1960). Even so, the State in effect gave the appellants complete discovery as contemplated by Rules of Crim. Proc., Rules 17.1 and 17.2 (1976). Therefore, we cannot say that the court was in error nor the appellants were in any way prejudiced by the technical failure to file a formal answer to the motion for a Bill of Particulars.

Limber argues that the court should have granted a mistrial when, during cross examination of a state policeman, Mrs. Limber's attorney asked the question: "Now, Sergeant R. L. Young is the expert, or one of the experts for the State Police and the State of Arkansas for giving polygraph tests, isn't he?" Both the prosecuting attorney and the attorney for Limber objected to this and an in-chambers hearing followed. The court admonished the jury and the attorneys that nothing more would be said about a polygraph test. Declaring a mistrial is an extreme remedy granted only when the error is so prejudicial that justice cannot be served by a continuation of the trial. It should not be granted when any possible prejudice can be removed by an admonition to the jury. *Gammel & Spann* v. *State,* 259 Ark. 96, 531 S.W. 2d 474 (1976). We cannot see in this case where either party was prejudiced by this question and if there was any prejudice, it was certainly removed by an admonition by the court. *Johnson* v. *State,* 254 Ark. 293, 493 S.W. 2d 115 (1973).

Limber objects to the admissibility of evidence regarding the injury to young Christian whose arms were broken. Limber argues that such evidence would be in the category of another offense, if any, irrelevant to the charge involving the child, Brad, and therefore inadmissible. *Alford* v. *State,* 223 Ark. 330, 266 S.W. 2d 804 (1954). The State contends that such evidence was relevant tending to show knowledge, intent, motive and a habit or practice of child abuse.

According to our Rules of Evidence, we find that the evidence regarding the injury suffered by Christian was relevant. Ark. Stat. Ann. § 28-1001, Rule 404 (b), (Supp. 1977), provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In the *Alford* case, cited by the appellant, we excluded evidence of another act, which was used to show the bad

character of the accused. However, we reiterated that other acts of misconduct *were* admissible when used to show "knowledge, intent or design, although they may be crimes."

We do not feel the trial court was in error in admitting the evidence regarding Christian because it is relevant to whether there existed intent, and the absence of mistake or accident.

Limber also argues that the evidence was insufficient to support the verdict. Although the evidence was circumstantial, it was substantial. On appeal we review the evidence in the light most favorable to the appellee and a conviction will be upheld if the evidence is substantial. *Hutcherson* v. *State*, 262 Ark. 535, 558 S.W. 2d 156 (1977).

Mrs. Limber argues on appeal essentially the same points raised by Limber. Since we have addressed those arguments regarding the Bill of Particulars and the admissibility of evidence about Christian, they will not be reiterated.

Mrs. Limber also argues that there was no evidence submitted by the State which connected her to any of the incidents or accidents that could have caused the death of Brad; that the State offered no evidence connecting her with any abuse that could have caused his death. We find no merit to this argument. The evidence, while circumstantial, indicated that she had argued several times with Limber about disciplining the children and whipping them; that Limber had beaten her and required her to seek medical assistance. She testified that she had seen him slap the child in the mouth and spank him with such force as to leave a bruise or red mark on his buttocks. She admitted that she had seen him use his foot on Brad's buttocks. She stated that she observed several bruises and cut places on Brad and she inquired of Limber about these and he explained them to her. She admitted that they had argued, perhaps twenty-five times, over his disciplining the children. Her complicity, according to the evidence, was more than an innocent bystander.

Both parties admitted that Limber had made a statement to her when they had an argument, in effect threaten-

ing her life. Mrs. Limber testified that: "He (Andrew) said the only way I was going to go to New York was in a coffin." He made this statement after they had argued and she had threatened to go home to her mother's in New York.

In summary, we find no error requiring reversal and ample evidence to support the jury's verdict in this case.

Affirmed.

We agree: HARRIS, C.J., and FOGLEMAN and BYRD, JJ.