Lynn O. DAVIS *v.* STATE of Arkansas

CR 95-645                                                925 S.W.2d 768

Supreme Court of Arkansas
Opinion delivered June 24, 1996

*Larry Dean Kissee*, for appellant.

*Winston Bryant*, Att'y Gen., by: *David R. Raupp*, Asst. Att'y Gen., for appellee. ·

BRADLEY D. JESSON, Chief Justice. Shortly after midnight on March 4, 1994, the appellant, Lynn Davis, and his girlfriend, Michelle Wilson, arrived at the emergency room of the Cleburne County Memorial Hospital. With them was Michelle's twenty-three-month-old son, Michael. Michael was in a state of cardiac arrest and was not breathing. His heartbeat was initially revived by use of CPR but he never regained consciousness. Two days later, he died. The medical examiner ruled Michael's death a homicide. In particular, he noted that Michael showed signs of having been shaken and otherwise abused.

The authorities began to search for Wilson and Davis but the couple had left the state and their whereabouts were unknown. With the assistance of the FBI, they were apprehended in California on March 16, 1994. They returned to Arkansas to face capital murder charges in Michael's death. Wilson was tried in Independ-

ence County. She was convicted of second-degree murder and received a sentence of eighteen years. The appellant was tried in Fulton County.[1] He was convicted of capital murder and sentenced to life without parole.

In this appeal, the appellant challenges the sufficiency of the evidence to support his conviction, challenges two of the trial court's evidentiary rulings, and argues that the court should have granted his petition for a writ of error *coram nobis*. After a careful review of the issues, we find no error and affirm. Additionally, in accordance with Arkansas Supreme Court Rule 4-3(h), we have examined the full record for rulings on objections or motions which were adverse to the appellant. None involves prejudicial error.

### Sufficiency of the Evidence

Our review of the sufficiency of the evidence requires a detailed recitation of the facts. Lynn Davis and Michelle Wilson began dating seriously in December of 1993. Wilson had two children: Kaite, age four, and Michael, almost two. She and Davis maintained separate residences, but spent virtually every night at Davis's apartment. Michael was almost always with them. Kaite often spent the night with her grandparents. Davis had worked for seven-and-a-half years at the same company. Wilson was temporarily unemployed.

Davis and Wilson, together with Michael, spent the night at Davis's apartment on Wednesday, March 2, 1994. The next morning, Davis dropped them off at Wilson's residence and went to work. Wilson and her next-door neighbor, Ruby Holt, spent the day running errands with Michael in tow. Michael, normally an active, temperamental child, was uncharacteristically sleepy during the day.

Later that afternoon, the errands completed, Holt, Wilson and Michael returned home. At some point, Kaite returned home as well. Wilson was cooking dinner in Holt's apartment when Davis arrived between 4:00 and 5:00 p.m. According to Holt, Michael was lying on the floor whining and crying. Davis was sitting at the

---

[1] The case originated in Cleburne County. Wilson and Davis each received a change of venue.

table with Holt and said to her, "I hate that kid." Holt was sure he was referring to Michael. Davis, Wilson, and the two children left shortly thereafter to go to Davis's apartment.

What happened next is known only to Davis and Wilson. According to them, they watched television with the children. Kaite fell asleep on the couch. At approximately 11:00 p.m. (according to Wilson) or 11:30 p.m. (according to Davis), they decided to take a shower. They noticed that Michael had a dirty diaper. Wilson went ahead and got in the shower. Davis followed, holding Michael, intending to clean him up in the shower. Michael began struggling and "throwing a fit" because he didn't want to be in the shower. Davis took him out of the shower, laid him on the bedroom floor, and told him to go ahead and throw his fit. He was preparing to diaper the boy when he noticed his eyes were staring fixedly. Davis "popped him on the butt" a couple of times, thinking Michael was holding his breath on purpose, but Michael did not move. Davis checked Michael's heartbeat and it was faint. He called to Wilson to get out of the shower. They grabbed the children, threw their clothes on and headed for the hospital.

Michael presented at 12:10 a.m. in a state of cardiac arrest. He was not breathing, and his color was blue. The physician on duty, Dr. Parker Jain, developed the impression that Michael had suffered a subdural hematoma and possibly had been the victim of abuse. Based upon his suspicion, he notified the authorities.

Detective Mark Baugh of the Heber Springs Police Department arrived at the hospital at 1:34 a.m. He learned from Dr. Jain that Michael had suffered not only a head injury but had bruises and sores on his body. He obtained a statement from Wilson in which she attempted to account for Michael's injuries. She attributed Michael's bruises to fighting with his sister. The sores, she claimed, were from shoes that fit too tight. The head injury, she explained, was the result of Michael slamming his own head against the refrigerator during one of his "fits."

Arrangements had been made for a helicopter to transport Michael to the Arkansas Children's Hospital in Little Rock. It arrived shortly after 2:00 a.m. Wilson and Davis made arrangements to have Ruby Holt take care of Kaite. They then drove to Children's Hospital, arriving about 4:00 to 4:30 a.m. Michael had a heartbeat, but was still not breathing on his own. Davis and Wilson

stayed at the hospital until approximately 12:00 noon that day then drove back to Heber Springs to shower and pick up a change of clothes. They returned to Little Rock later that afternoon. Upon their return, Davis was refused entry to the hospital. Security personnel told Davis that Michael's father was on the premises and they wanted to avoid trouble. Wilson stayed at the hospital while Davis returned to Heber Springs. He was en route when he received a call from Wilson on his mobile phone. She informed him that she was being accused of inflicting Michael's injuries, that the Department of Human Services had taken custody of her children, and that she had been "kicked out" of the hospital. Davis immediately returned to Little Rock and picked her up.

The two then decided, for reasons unexplained, to go to Conway, where they spent the night in a motel. They spoke by phone with Ruby Holt who informed them that the police were looking for Wilson. The next day, Saturday, March 5, 1994, they left the state of Arkansas.

In the meantime, Detective Baugh continued his investigation. During the day on March 4, he spoke with the physicians at Children's Hospital and discovered the full extent of Michael's injuries. Dr. Michael Avant, a pediatric intensive care physician at Children's, would later testify that he made note of twenty-seven injuries, including a subdural hematoma, massive brain swelling caused by trauma and oxygen depletion, retinal hemorrhaging, a pulmonary contusion, a broken rib, burns consistent with being inflicted by a cigarette and a car cigarette lighter, a swollen and bruised testicle and scrotal sac, including a bruise in this area which was just a few hours old. Upon receipt of this information, Baugh attempted to locate Davis and Wilson. He was unsuccessful.

Michael died on March 6. Baugh received an autopsy report from Dr. Frank Peretti which concluded that Michael's death was the result of homicide. Causes of death were listed as craniocerebral trauma and chest injuries with the contributing factors of thermal burns and testicular contusions. Based upon this information, charges were filed against Wilson and Davis for capital murder.

Baugh continued to search for Davis and Wilson. He became convinced that they were no longer in the state, and enlisted the assistance of the FBI in locating them. Davis and Wilson were, in fact, on the run. After leaving Conway, they had driven to Louisi-

ana, through Texas, and into New Mexico. When they learned that Michael had died, they abandoned Davis's car at the El Paso airport and flew to San Diego. There, they took a train to Los Angeles where they visited the beach, the zoo, and planned to visit Disneyland. Their trip had been financed with Davis's credit cards.

On March 16, 1994, the FBI caught up with Davis and Wilson in Los Angeles. They were turned over to the Santa Monica Police Department. There, they were interviewed at length by Detective Steve Rosenfeld. The interviews were videotaped and were admitted into evidence at trial. In her interview, Wilson once again attempted to explain Michael's injuries in ways that did not implicate either herself or Davis. She said that on the Tuesday before Michael was admitted to the hospital, he had become angry because she wouldn't let him have a piece of cake. He began to slam his head against the refrigerator and the wall. The next day, which was Davis's day off, the three of them went to the mall and to eat pizza. Michael became angry again and hyperventilated to the extent that he made himself sick. Wilson said that the sores on Michael's toes were from tight shoes. When confronted with the possibility that the sores were in fact cigarette burns, she admitted that she may have accidentally burned Michael. She explained the injuries to his testicles by saying that, two months previously, he had fallen from a small bicycle, and six days before his death, he had fallen in the bathtub. But ultimately, after a lengthy interrogation, she admitted that, on the Wednesday before Michael's death, she had shaken him hard and "probably" caused his death.

Wilson claimed that Davis was not involved in Michael's death. Detective Rosenfeld questioned her intently on whether Davis had merely laid the boy on the floor after getting out of the shower, or had thrown him to the floor. He asked her to demonstrate Davis's actions. Her demonstration indicated that Davis was upset and, at the least, dropped Michael to the floor with some force.

In Davis's interview, he denied any involvement in Michael's death and denied awareness of any abuse which may have been inflicted by Wilson. Both his story and Wilson's were remarkable for their presentation of detail. For example, both mentioned, without being asked, the number of crackers Michael ate on Thursday evening. Additionally, both of them asked, without prompting, if they might begin their explanation of events starting with the Tuesday before Michael's death. The stories also contained some

inconsistencies. In Wilson's statement to Baugh, she was clear that the three of them began their shower just after 11:00 p.m. In the Rosenfeld interviews, Davis and Wilson indicate that the time is 11:30 p.m. Wilson told Baugh that she did not see Davis spank Michael after he was taken out of the shower. She told Rosenfeld that she did. Both Wilson and Davis said that Michael hated to take a bath or get his hair wet. Yet when Davis was explaining that Michael's testicle was injured while getting out of the bathtub, he stated that both kids loved playing in the water.

Further evidence was presented to the jury in the form of Dr. Peretti's testimony, complete with autopsy pictures. The photographs revealed with disturbing clarity the scars and sores on the child's belly button, calf, thigh, and toes which Dr. Peretti characterized as cigarette burns. They also revealed bruises around the child's neck and head and the fact that the child's scrotal sac was obviously bruised and very swollen. Dr. Peretti testified that some of the cigarette burns were less than ten days old. Other injuries characterized by the doctor as "recent" were the subdural hematoma, the hemorrhaging along the optic tracks, the fractured rib, and the bruised scrotal sac. The doctor testified that Michael's injuries and were consistent with being shaken and, two days later, being subjected to a significant trauma within a short time before his admission to the hospital. Dr. Avant concurred that Michael had been subjected to significant trauma prior to being admitted to the hospital. He stated that the trauma would had to have been caused by something more than the child banging his head against a wall or being hit by his sister. He characterized the type of trauma necessary to inflict such a head injury as a "violent force." He said the brain swelling was of the type that might be seen in a car accident.

Finally, the jury was presented with the testimony of Angel Attendorn, Davis's ex-wife. Attendorn testified that in June of 1993, Davis had administered severe beatings to her four-year-old daughter. She produced four photographs which revealed serious bruising on the child's back, buttocks, and upper thighs.

The appellant was charged with committing capital murder in the manner described by Ark. Code Ann. § 5-10-101(a)(9) (Supp. 1995):

A person commits capital murder if:

Under circumstances manifesting extreme indifference to the

value of human life, he knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed, provided that the defendant was eighteen (18) years of age or older at the time the murder was committed.

The State was required to prove four elements to convict the appellant: that Michael was age fourteen or younger, that the appellant was age eighteen or older, that the appellant knowingly caused Michael's death, and that Michael's death was caused under circumstances manifesting extreme indifference to the value of human life. The third and fourth elements are in controversy.

■ At the close of the state's evidence and at the close of all evidence, the appellant moved for a directed verdict on the ground that the state had not proven he acted knowingly or under circumstances manifesting extreme indifference to the value of human life. A directed-verdict motion is a challenge to the sufficiency of the evidence. Sufficient evidence means substantial evidence to support the jury's verdict. Substantial evidence is that which is forceful enough to compel a conclusion one way or another and which goes beyond speculation and conjecture, We review the evidence in a light most favorable to the appellee and consider only that evidence which supports the verdict. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996).

■ A person acts "knowingly" with respect to his conduct or attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist. He acts "knowingly" with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result. Ark. Code Ann. § 5-2-202(2) (Repl. 1993). A person acts "under circumstances manifesting extreme indifference to the value of human life" when he engages in deliberate conduct which culminates in the death of some person. *Burnett v. State*, 295 Ark. 401, 749 S.W.2d 308 (1988); *Pruett v. State*, 287 Ark. 124, 697 S.W.2d 872 (1985).

The appellant, citing *Midgett v. State*, 292 Ark. 278, 729 S.W.2d 410 (1987), argues that the State did not meet its burden of proof. He implies that the State was required to prove premeditation and deliberation, but that is not so. A brief historical review is helpful at this point. We decided *Midgett* in 1987. The case involved

the death of an eight-year-old boy at the hands of his father. The father was convicted of first-degree murder, which required proof of premeditation and deliberation. We recognized that state law, at that time, did not permit a conviction of first-degree murder for child abuse or torture in the absence of premeditation and deliberation. We therefore reduced Midgett's conviction to second-degree murder.

Approximately one month later, the legislature responded to our decision in *Midgett*. The definition of first-degree murder was amended to include knowingly causing the death of a person age fourteen or younger under circumstances manifesting cruel and malicious indifference to the value of human life. See Act 52 of the First Extraordinary Session of 1987. In 1991, the legislature, with a slight revision in language, converted that definition of first-degree murder into a type of capital murder. The words "under circumstances manifesting cruel and malicious indifference to the value of human life" were deleted from the first-degree murder statute. A category of capital murder was created which exists today as Ark. Code Ann. § 5-10-101(a)(9) (Supp. 1995). See Act 683 of 1991.

The *Midgett* case, thus, is not applicable here. The crime charged does not require proof of premeditation and deliberation. More on point is the case of *Porter* v. *State*, 308 Ark. 137, 823 S.W.2d 846 (1992). Although it was a first-degree murder case, the offense was committed at a time when the first-degree murder statute contained language virtually identical to today's § 5-10-101(a)(9). In *Porter*, we held that substantial circumstantial evidence of a cruel, malicious and continuous course of child abuse culminating in a violent act that causes the child's death is sufficient to sustain a conviction for knowingly causing the death of a person age fourteen or younger under circumstances manifesting a cruel and malicious indifference to human life. As in *Porter*, we hold in this case that the evidence, though circumstantial, is sufficient to support the appellant's conviction. It is clear that the jurors did not embrace Davis's and Wilson's explanation of the events surrounding Michael's death. They might well have found their testimony so totally at odds with the medical evidence as to be a fabrication. See *Porter* v. *State*, *supra*. Additionally, the obvious and graphic nature of Michael's injuries as depicted by the autopsy photos belies Davis's claim that he was unaware that Michael had been abused. A jury is not required to believe all or any part of a defendant's or witness's

statement, *Patterson* v. *State*, 306 Ark. 385, 815 S.W.2d 377 (1991), and is entitled to draw upon common sense and experience in reaching its verdict. *Owens* v. *State*, 283 Ark. 327, 675 S.W.2d 834 (1984). The State's proof contained evidence that Davis threw Michael to the floor in a forceful manner; strong medical testimony of recent, significant head trauma and other serious abuse; Ruby Holt's testimony regarding Davis's animosity toward Michael; Davis's abuse of another child, see *Limber* v. *State*, 264 Ark. 479, 572 S.W.2d 402 (1978); and Wilson's and Davis's flight to avoid arrest (which included stringent efforts to hide from the authorities, abandonment of Davis's automobile, and the fact that Davis, in order to flee, left a job of long standing). See *Cooper* v. *State*, 317 Ark. 485, 879 S.W.2d 405 (1994). These facts, along with all others set forth in this opinion, constitute sufficient evidence of Davis's guilt of capital murder.

### *Evidentiary Errors*

Prior to trial, Davis moved in limine to prohibit the State from mentioning a charge of battery filed against him in 1993. The charge stemmed from his alleged beating of the child of his ex-wife, Angel Attendorn.[2] In a pretrial hearing, the State agreed that the motion should be granted and agreed not to mention the charge in their case-in-chief. Without further discussion, the trial court granted the motion.

During opening statements, the prosecutor told the jury that, in Davis's videotaped statement, Davis would admit that battery charges had previously been filed against him. Davis moved for a mistrial and an *in camera* hearing was conducted. The prosecutor explained that, since Davis had agreed to let his videotaped statement come into evidence in its entirety, the *in limine* order was no longer operative. The trial judge, considering the merits of the issue for the first time, decided to allow admission of the evidence. He agreed to give a cautionary instruction, which was done just before Davis's videotape was played.

Davis argues on appeal, as he did at trial, that admission of the evidence violated A.R.E. Rule 404(b) and Rule 403. Rule 404(b)

---

[2] The charge was *nolle prossed*, according to Angel Attendorn, because she was fearful of pursuing the case.

reads as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Davis cites *Diffee* v. *State*, 319 Ark. 669, 894 S.W.2d 564 (1995) in support of his argument. In *Diffee*, the State was attempting to prove that the method used by the appellant to commit murder — an ice pick — was her "method of operation." In doing so the state offered evidence of another ice-pick attack committed by the appellant. We held that the evidence was inadmissible and set forth a test for using prior acts to show method of operation. But *Diffee* is not applicable in this case. Davis's prior crime was admitted here to show absence of mistake or accident, not method of operation.

The trial judge cited *Limber* v. *State*, *supra*, in ruling that Davis's 1993 battery charge was admissible. *Limber* is representative of a number of cases involving child victims in which we have permitted evidence of crimes committed by the defendant against other children. See *Clark* v. *State*, 323 Ark. 211, 913 S.W.2d 297 (1996); *Fry* v. *State*, 309 Ark. 316, 829 S.W.2d 415 (1992); *George* v. *State*, 306 Ark. 360, 813 S.W.2d 792 (1991), all involving sexual abuse. In *Limber*, the appellant and his wife were charged with the murder of the wife's son. They claimed, as did Davis and Wilson, that the child's injuries resulted from accidents. Evidence was admitted that another child in the appellants' household had suffered two broken arms. We allowed the evidence as being probative of absence of mistake or accident. The case is virtually on point with the case at bar. Davis attempts to distinguish it by arguing that, in *Limber*, the appellant and the two abused children were members of the same household. While Michael might not have been an official or legally recognized member of Davis's household, the evidence shows that he was a *de facto* member. Michael and his mother routinely spent every night with Davis. Davis was an omnipresent adult in Michael's life, much as he might have been if they had been living under one roof.

■■ The trial judge is accorded discretion in ruling on

404(b) questions. *Fry v. State, supra.* A mistrial is a drastic remedy which should be resorted to only when there has been error so prejudicial that justice cannot be served by continuing the trial. *Stewart v. State,* 320 Ark. 75, 894 S.W.2d 930 (1995). A trial judge's denial of a mistrial will not be disturbed on appeal absent an abuse of discretion. *Weaver v. State,* 324 Ark. 290, 920 S.W.2d 491 (1996). We hold that the trial judge did not abuse his discretion in denying a mistrial in this case. We also hold that the probative value of the evidence was not outweighed by the danger of unfair prejudice. A.R.E. 403.

■ Davis also attacks the judge's ruling on the ground that the original order *in limine* should have been honored. To support his argument, he relies on the law-of-the-case doctrine. That doctrine is inapplicable here. It ordinarily arises in the case of a second appeal and requires that matters decided in the prior appeal be considered concluded. See *Fairchild v. Norris,* 317 Ark. 166, 876 S.W.2d 588, *cert. denied,* 513 U.S. 974 (1994). During the course of a single trial, the judge is at liberty to reconsider his or her prior rulings. *Hill v. State,* 276 Ark. 300, 634 S.W.2d 120 (1982).

The second evidentiary ruling challenged by Davis is related to the first. As we have already mentioned, during the course of Angel Attendorn's testimony, four photographs of her daughter were introduced into evidence. The photos depicted a badly bruised child. Davis argues that the photos were irrelevant or, alternatively, unfairly prejudicial because they depicted injuries suffered by the child in the course of her daily activities. He bases this claim on Attendorn's testimony on cross-examination. Attendorn had apparently told the police that some of her child's bruises were from normal activity. However, on the witness stand, she said that any old bruises visible in the pictures were the result of Davis's beatings. She said that her child had bruises on the front of her legs from ordinary activity. The photographs did not depict the front of the legs.

■ The admission of photographs is within the trial court's discretion. *Williams v. State,* 322 Ark 38, 907 S.W.2d 120 (1995). The mere fact that photos are inflammatory will not render them inadmissible. If they enable a witness to testify more effectively or tend to corroborate testimony, they have evidentiary value which outweighs their inflammatory effect. *Weger v. State,* 315 Ark. 555, 869 S.W.2d 688 (1994). Our examination of Attendorn's testimony

shows that she sufficiently explained her statement to the police or, at the least, presented the jury with a question as to her credibility. The photographs themselves illustrated to the jury the extent of the abuse in a way that Attendorn's words could not. In addition, they corroborated Attendorn's accusations. We hold that the trial court did not abuse its discretion in admitting the photos. See *Van Sickle* v. *State*, 16 Ark. App. 143, 698 S.W.2d 308 (1985).

### Error Coram Nobis

Two months after his notice of appeal was filed, Davis petitioned the court for a writ of error *coram nobis*. He claimed that the jury foreman, William Newton, had been misleading in his responses during voir dire. A hearing was held and the trial judge denied the writ.

Error *coram nobis* is a rare remedy. It is available only where there is an error of fact extrinsic to the record, such as insanity at the time of trial, a coerced guilty plea, or material evidence withheld by the prosecutor, that might have resulted in a different verdict. *Taylor* v. *State*, 303 Ark. 586, 799 S.W.2d 519 (1990). The writ has also been used in cases in which a third party confessed to the crime during the time between conviction and appeal. *Smith* v. *State*, 301 Ark. 374, 784 S.W.2d 595 (1990). We decline to extend the use of the error *coram nobis* remedy to a case involving a juror's allegedly misleading responses during voir dire.

Affirmed.

DUDLEY, J., not participating.