Carl Dale BRANSTETTER *v.* STATE of Arkansas

CR 00-1315 57 S.W.3d 105

Supreme Court of Arkansas
Opinion delivered September 20, 2001
[Petition for rehearing denied October 18, 2001.]

---

*Jeff Rosenzweig* and *J. Blake Hendrix*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Appellant Carl Dale Branstetter appeals his conviction of capital murder and sentence of life without parole imposed for causing the death of J.N., the eight-year-old son of LaDonna Murray. Branstetter asserts a number of errors in the trial court require reversal. First, Branstetter argues that there was insufficient evidence to support the jury verdict. Branstetter also argues error in admission of evidence of prior injuries suffered by J.N. and his sister K.N. Branstetter additionally argues error in the trial court's refusal to admit a statement of J.N.'s mother that partially exonerates him. Branstetter next argues error for failure to find the capital-murder statute void for vagueness in that the term "circumstances manifesting extreme indifference to the value of human life" has been defined by this court in a contradictory fashion in past cases. Branstetter also argues error in rejecting proffered jury instructions. Finally, Branstetter argues error in refusing to reinstate peremptory challenges he alleges he was compelled to use on jurors who should have been excused for cause. He asserts this required him to accept a juror he would have excused had he still had a peremptory challenge. We hold there is no error and affirm.

*Facts*

In 1998, LaDonna and Eric Murray were married and living in Hot Springs. K.N. and J.N. were living with them. LaDonna and Eric were having marital difficulties, and in August 1998, LaDonna, K.N., and J.N. moved a couple of houses down to live with Branstetter. At this time K.N. was ten years old and J.N. was eight.

K.N. testified that while they were living with Eric Murray, punishment involved grounding and being spanked, but only spanking with the hand. She then testified that when they moved in with Branstetter, he took an active part in the childrens' punishment and that punishment increased initially to being spanked with a belt, and that later it became more severe. K.N. testified that her mother began to strike her with an open hand and, on at least one occasion, "busted" her lip. She went on to testify that Branstetter also struck her with an open hand but then began using his fist. She stated further that Branstetter would strike both she and J.N. in the face and head. K.N. also testified she saw Branstetter strike J.N. in the stomach.

K.N. was asked about an incident in April of 1999 when J.N. became ill. She had no recollection of J.N. falling from a tree, which was the reason Branstetter gave doctors for the injuries J.N. suffered. She did recall that at that time J.N. had stomach pains so severe he walked bent over. She described him as looking like "the hunchback of Notre Dame." K.N. stated she was not told how he had been injured.

Dr. Heinemann, a pediatrician, saw J.N. in April 1999 on a scheduled visit to do a check-up for his Attention Deficit Disorder and school behavior. LaDonna gave a history to the nurse that J.N. was there for the check-up and that he had had fever and stomach pain for four days. Dr. Heinemann noticed J.N. appeared to be ill and found he was running a fever. Dr. Heinemann examined J.N. and found he was in great pain. She feared he had a ruptured appendix and described him as "really hurting." Dr. Heinemann directly admitted J.N. to St. Joseph's Hospital in Hot Springs. At the hospital, J.N. came under the care of surgeon Dr. Brunner. He reviewed a CT scan and determined J.N. was suffering from an abscess. Preoperatively, Dr. Brunner found a four-to-five-inch bruise above J.N.'s waist on the right. Dr. Brunner testified his history revealed J.N. had been sent to school and sent home due to

the injury, that this had gone on for several days despite the severe pain.

Dr. Brunner described J.N. as "frail." At this time, he only weighed about fifty pounds although he was eight years old. Dr. Brunner performed surgery and determined J.N.'s appendix was not involved, but rather found a hole in the small intestine just below the stomach that was the cause of the infection. He expressed the opinion it takes a very specific force to cause such an injury. He testified that the history he received from Dr. Heinemann was J.N. had fallen from a tree. Dr. Brunner testified the injury required a blow to the stomach such as a punch, and that Branstetter reported J.N. had suffered the injury falling from a tree. Branstter stated he had not seen it happen. Later he told others he had. Dr. Brunner stated falling from a tree would not cause such an injury unless J.N. had fallen on an object such that he suffered a blow similar to a punch. No such history was given.

J.N. improved in the hospital after the surgery, but a fever persisted due to a residual infection from the extensive abscess, which required a second operation. More time was needed to allow the infection to clear. However, before that was achieved, Branstetter and J.N.'s mother insisted he be transferred to Arkansas Children's Hospital in Little Rock. This was done. After a couple of days at Children's, J.N. was sent home. K.N. testified J.N. was doing well after he came home.

However, according to K.N., the environment in the home did not improve. In June, she was caught lying and was subjected to blows with a one-by-two-inch board on her rear end. K.N. testified she was struck only by Branstetter and was struck more than ten times. She said her mother was present at the beating but did not intervene. K.N. testified further that the injury from the beating was so severe she could wear no clothing and would lay on her stomach to avoid anything touching the injury. She reported her mother and Branstetter promised to take her to a doctor but did not do so. They did provide salves. When she later received treatment during foster care, the injury was so severe the physician initially thought it was a third-degree burn. Branstetter claimed K.N. received this injury by falling off a go-cart and being dragged. Branstetter attempted to get his neighbor, John Garner, to tell the authorities that K.N. received the injuries to her rear end in this manner.

On June 23, 1999, while K.N. was suffering from this injury, she noticed J.N. standing in front of a wall, something she knew meant he was in trouble. She saw him as she went to the bathroom. K.N. was still in bed with her injury but later went upstairs to watch TV and testified she required assistance from her mother to get up the stairs. Once there, she laid on the floor to be able to watch TV. Branstetter had come home by this time and was seated on the couch with their mother. J.N. was standing in front of Branstetter. K.N. stated she could tell J.N. was in trouble, but she did not know what for. Branstetter was asking him questions. She then saw Branstetter strike J.N. on the head and in the stomach. This was only a few weeks after J.N.'s abdominal surgery when Branstetter was told by doctors the injury was so severe that his recovery was not assured. K.N. then testified that Branstetter then began to strike J.N. again and at this point her mother asked K.N. if she wanted ice cream. She did. Her mother left the room to get the ice cream. K.N. testified that by then J.N. was being struck so hard he was falling to the floor. Each time he was commanded to stand back up. K.N. stated J.N. asked Branstetter to stop, but he did not. Branstetter was continuing to ask questions of J.N. J.N. then began to scream, and Branstetter began screaming J.N.'s name. K.N. stated that it was about this point J.N. could stand no more. He was unconscious. She believes her mother then tried to take his blood pressure and told her to go downstairs and get dressed. K.N. further stated that at this time, Branstetter continued to yell out J.N.'s name and that he went downstairs and began to scatter tools in the stairwell. Branstetter then called his mother and told her they were taking J.N. to the hospital because he was hurt. Branstetter told K.N. she was to tell the story that J.N. had fallen down the stairs.

Upon arrival at the hospital, J.N. was unconscious. The emergency room doctor intubated him and had a CT scan done. Dr. James Arthur was called in as a neurosurgeon. He found J.N. to be small and stated he appeared to be about six years old instead of eight. Pressure was building within J.N.'s skull, and Dr. Arthur performed surgery to relieve that pressure. He found the brain was swollen in the right temporal region so severely that to try to reduce pressure to acceptable levels he had to remove the right temporal lobe of J.N.'s brain.

J.N.'s pupils were fixed, and there was very little reaction to any stimuli. Dr. Arthur noticed bruising about J.N.'s head and additional bruising on his chest. There was also bruising on his neck. He then found bruises and abrasions on his legs and arms in various stages of healing.

J.N. was put in ICU, where despite the physican's and nurse's efforts, the pressure within his skull continued to climb. After twenty-four hours, J.N. was no longer spontaneously breathing. On June 26 they did an EEG and found no brain activity. A second EEG was done on June 27. Again there was no brain activity. Life-support equipment was turned off, and J.N. was declared dead.

Dr. Arthur visited Branstetter's home after J.N.'s death and viewed the stairs where the fall was reported to have occurred. There were five steps. Dr. Arthur opined the injuries to J.N. were not consistent with such a fall, but rather were consistent with repeated blows to the head.

Dr. Steven Erickson performed an autopsy. He testified there was "a whole lot of injury from the level of the knees upward." As to J.N.'s head, he found a large deep bruise on J.N.'s left jaw, as well as other bruising to the head. Dr. Erickson noted that due to the surgical intervention, he was not able to opine if additional similar injuries might have been masked by the damage of surgery. He examined the remainder of J.N.'s body as well. He found three different areas of significant bruising and injury on J.N.'s neck and collarbone. He found a series of bruising from J.N.'s armpit across his chest, bruising so severe that it reached down through all his tissue to his rib cage. Dr. Erickson also found injuries and abrasions on his right arm, on his left forearm, a three-quarter by nine-sixteenths inch ulceration, and bruising and injuries to his legs that were inconsistent with injuries that might have been received in play. Dr. Erickson finally opined that the injury to the abdomen suffered in April 1999 was not consistent with an accident but rather was consistent with a punch or a kick. He found the injuries to J.N.'s head were consistent with repeated blows and that the death was a homicide resulting from chronic child abuse.

### Sufficiency of the Evidence

▮ Branstetter argues there was insufficient evidence to support his conviction and asserts that the trial court erred in denying his motion for a directed verdict. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.; Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a

conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999).

Branstetter alleges the State failed to show that under circumstances manifesting extreme indifference to the value of human life he knowingly caused J.N.'s death. He alleges that the facts at most show recklessness. The facts show Branstetter brutally beat a frail eight-year-old boy to death. The jury could have reasonably inferred from the evidence that this was not a spanking or discipline action that got out of hand. The boy died because he was repeatedly beaten in the head, beaten so severely that he fell unconscious and then suffered death due to injury to his brain.

The relevant facts in this case begin in August 1998 and show J.N. and K.N. were progressively subjected to ever greater abuse as the months passed. The evidence showed Branstetter was involved in the discipline of J.N. and K.N. The evidence reflects the abuse suffered by J.N. and K.N. increased in intensity until J.N. was punched or kicked so hard that his small intestine was punctured against his spine, and that just a few weeks after J.N. was released from this surgery, Branstetter was punching him in the stomach and head. The injuries to his head were so severe that J.N. suffered death.

The medical evidence showed an underweight eight-year-old boy who had highly suspicious injuries from his shins to the top of his head. Most were bruises, some quite severe, and all injuries were found by the medical examiner to be inconsistent with injuries one would expect to see resulting from play. Rather, the injuries were what would be expected from physical abuse. J.N. was living in Branstetter's home when he received all of these injuries. Branstetter provided most of the history to doctors both in April and in June. Most of the contact with the hospitals was by Branstetter. Branstetter was present and involved in discussions with doctors in April 1999 regarding J.N.'s abdominal abscess caused by a blow to his stomach. Branstetter was aware it was life threatening, that not all children who suffer such an injury survive. Nevertheless, it was but a few weeks later Branstetter was punching J.N. in the stomach.

There can be no viable claim of accident or mistake under these facts. Branstetter additionally admitted to, at the least, participation in beating K.N. which occurred shortly before J.N.'s death. K.N. testified Branstetter was the only person involved in that beating.

According to K.N.'s testimony, while J.N. was standing before Branstetter on June 23, Branstetter was screaming J.N.'s name, and this was shortly followed by Branstetter striking J.N. with such blows to his head that he was thrown to the floor. She further testified that there were additional similar blows to J.N.'s head and that when he fell to the floor, Branstetter commanded J.N. to stand back up. She yet further testified that Branstetter struck J.N. in the stomach. Finally, the evidence showed that it was only when J.N. could no longer stand up and was unconscious that the assault ceased, and that then the screaming continued as Branstetter went downstairs to place tools so as to be able to claim J.N. had fallen down the stairs. Only then did Branstetter take J.N. to the hospital.

█ There was more than sufficient evidence to support the jury's conclusion that Branstetter was guilty of capital murder.

### Injuries Suffered by J.N. and K.N. Prior to June 23rd

Over objection, the State introduced evidence of prior injuries suffered by both K.N. and J.N. More specifically, evidence was offered to show the before-mentioned beating K.N. suffered shortly before the fatal assault on J.N. Evidence was offered to show Branstetter participated in this beating and that K.N. was beaten with a 1 x 2 inch board. These injuries were still healing when J.N. suffered his fatal injuries.

Additionally, Branstetter complains of admission of the evidence of J.N.'s abdominal injury in April 1999, which resulted from a blow so severe that his small intestine was punctured as it was thrust against his spine. J.N. endured horrible pain before he was taken for care, resulting in two surgeries and over a week in the hospital. Finally, there was evidence offered of significant other bruising and injury on J.N.'s body from his knees to the top of his head. The medical examiner testified of a series of bruises on J.N.'s chest so severe they reached all the way down through the tissue to his rib cage, and further of abrasions and scrapes on his arms, and yet further of injuries to his legs that were too atypical and severe to

attribute them to normal minor injuries resulting from a child's play. The medical examiner found chronic child abuse.

 Branstetter objected to the evidence of other injuries as character evidence excluded by Ark. R. Evid. 404. The State is not permitted to adduce evidence of other offenses for the purpose of persuading the jury that the accused is a criminal and is therefore likely to be guilty of the crime at issue. Ark. R. Evid. 404(a). *See also, Henry v. State*, 309 Ark. 1, 828 S.W.2d 346 (1992); *Ford v. State*, 276 Ark. 98, 633 S.W.2d 3 (1982).

 However, that it is evidence of other crimes does not necessarily make it inadmissible character evidence. The evidence may have a tendency to make the existence of a relevant material fact more or less probable. If such evidence of other conduct or offenses is independently relevant in that they tend to prove some material fact, the evidence is admissible. *Morgan v. State*, 308 Ark. 627, 826 S.W.2d 271 (1992); *Henry, supra*. Rule 404 acknowledges this in subsection b. Such evidence is not character evidence, and, thus, is not subject to exclusion under Rule 404. If the evidence of prior bad acts is relevant to show that the offense of which Branstetter is accused occurred, then it will not be excluded by Rule 404. *Sullivan v. State*, 289 Ark. 323, 711 S.W.2d 469 (1986).

 In this case, two young children suffered severe life–threatening physical abuse at the hands of someone to whom they had a right to look for care, protection, and nurture. The abuse commenced in August 1998 and was ongoing until the brutal and deadly beating of June 23 that took J.N.'s life. When asked about these injuries, the explanations by Branstetter were consistent, that they resulted from accidents. Whether the injuries of June 23 were the result of accident was thus put in issue by Branstetter. Intent was also at issue. In previous cases similar to the present case, this court has found that where children are concerned, evidence of physical injuries to other children in the home and even to a child in another home is probative of intent and the absence of mistake or accident. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996); *Limber v. State*, 264 Ark. 479, 572 S.W.2d 402 (1978). In *Davis*, the appellant was convicted of capital murder in the death of his girlfriend's twenty-three-month-old son. On appeal he argued error in the admission of evidence he had earlier beaten and been charged with battery of his former wife's young daughter. Davis argued the State was attempting to show "method of operation," which was impermissible under this court's holding in *Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995). This court found Davis's prior crime was

admitted to show absence of mistake or accident, not method of operation, and, therefore, *Diffee* was inapplicable, and the evidence was admissible.

In the earlier case of *Limber, supra,* evidence of two broken arms suffered by an older brother of the child who was killed by the appellant was at issue. These injuries were suffered prior to the murder and, again, the claim by appellant was accident. This court held admission of the prior injuries to the brother was not in error because it was relevant to intent and the absence of mistake or accident.

■ The admission of the evidence was not in error under the holdings in *Davis* and *Limber, supra.* It had a tendency to make it more probable the injuries were not the result of an accident or mistake and, thus, the evidence was relevant under Ark. R. Evid. 401. It also bears on intent. The evidence was not offered to show the bad character of Branstetter in an attempt to give the jury reason to believe that Branstetter is the type of person who would commit such an act, but rather was offered to show intent and lack of mistake or accident in the presently charged crime. The evidence is independently relevant proof of Branstetter's intent and the absence of mistake or accident in committing the offense. The evidence is admissible under the intent and absence-of-mistake-or-accident exception to Ark. R. Evid. 404(b).

■ Branstetter further argues that even if the evidence was relevant it was so prejudicial that under Ark. R. Evid. 403, the trial court abused its discretion when it refused to exclude it on that basis. The standard of review is abuse of discretion. *Mixon v. State,* 330 Ark. 171, 954 S.W.2d 214 (1997). The fact that evidence is prejudicial to a party is not, in itself, reason to exclude evidence. The danger of unfair prejudice must substantially outweigh the probative value of the evidence. *Marvel v. Parker,* 317 Ark. 232, 878 S.W.2d 364 (1994). Here the trial court gave an instruction that the evidence was not to be considered as evidence of character. The probative value of the evidence in showing intent and a lack of accident or mistake was very great and outweighed the prejudicial effect. There was no abuse of discretion by the trial court in allowing the introduction of this evidence.

## Statement of LaDonna Murray

At trial, Branstetter sought to introduce a statement of LaDonna in an attempt to discredit K.N.'s testimony by using the statement in cross-examining K.N. K.N. testified that her mother had not participated in her beating, and LaDonna's statement indicated she had. Another statement existed wherein LaDonna denied any participation. In the statement Branstetter sought to introduce, LaDonna did not exculpate Branstetter, but rather indicated she had initiated the beating and then Branstetter joined in. Branstetter asserts the trial court erred when it refused to admit this statement. Branstetter argues more specifically that Ark. R. Evid. 804(b)(3) allows admission of this statement as one against interest. One of the requirements of the rule is that the declarant be unavailable. She was. LaDonna refused to testify by availing herself of her Fifth Amendment rights.

██ However, as noted, LaDonna's statement only admitted her involvement in the beating and did nothing to exonerate Branstetter. This court very recently discussed a statement against interest that incriminated the declarant but did not entirely exculpate him. *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). In *Cox*, this court questioned the application of the rule where accomplices are involved. Under those circumstances, an admission by one does not exculpate the other. This court found the rule inapplicable, and, for the same reasons, it is inapplicable here. LaDonna's statement did not even attempt to exculpate Branstetter, and, thus, the rule is even less applicable under these facts.

██ Branstetter also argues that even if Rule 804 is not applicable, this exclusion of evidence constituted a mechanical application of the hearsay rule to defeat his due-process rights and right of confrontation depriving him of the ability to put on a defense. There is no issue as to confrontation and opportunity of cross-examination. What Branstetter complains of is if the statement had been admitted, he could have questioned K.N. as to why she said her mother was not involved when her mother admitted she was. Nothing stopped Branstetter from cross-examining K.N. LaDonna did not testify, so the statement could not be used as a prior inconsistent statement to impeach her. We also note that there is at least one other statement wherein LaDonna denied involvement, which means at trial her statements would have, in effect, nullified each other on this issue, and the statements were untrustworthy. There was no abuse of discretion.

### Circumstances Manifesting Extreme Indifference
### to the Value of Human Life

Branstetter alleges that he was not on notice that brutally beating a frail eight-year-old boy in the head so as to cause his death constituted circumstances manifesting extreme indifference to the value of human life and that, therefore, his conviction should be overturned. Branstetter alleges this court has not consistently defined the term "under circumstances manifesting extreme indifference to the value of human life." He argues cases wherein this court has discussed that term under other statutes such as DWI.

 The capital murder statute provides the required intent, which is "knowingly." That term is specifically defined in Ark. Code Ann. § 5-2-202(2)(Repl. 1997). Ark. Code Ann. § 5-10-101(a)(9) (Repl. 1997) requires "he knowingly cause the death of a person fourteen (14) years of age or younger. . . ." The questioned phrase adds that for the crime to fit the requirements of capital murder, the knowing act must be committed "under circumstances manifesting extreme indifference to the value of human life." In the context of capital murder cases this court has already stated, "The words 'manifesting extreme indifference to the value of human life' indicate that the perpetrator of capital murder must act with deliberate conduct that culminates in the death of some person." *Davis, supra. See also, Flowers v. State*, 342 Ark. 45, 25 S.W.2d 422 (2000); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *McGehee v. State*, 328 Ark. 404, 943 S.W.2d 585 (1997). Here, there was deliberate conduct that culminated in the death of eight-year-old J.N. Thus, there is no merit to Branstetter's argument.

### Refused Jury Instructions

 Branstetter alleges the trial court erred in refusing three jury instructions he provided based upon Ark. Code Ann. § 5-2-605 (Repl. 1997), § 5-2-614 (Repl. 1997), and § 5-2-406 (Repl. 1997). In determining if the trial court erred in refusing an instruction in a criminal trial, the test is whether the omission infects the entire trial such that the resulting conviction violates due process. *Conley v. State*, 270 Ark. 886, 607 S.W.2d 328 (1980). *See also, Cox-Hilstrom v. State*, 58 Ark. App. 109, 948 S.W.2d 409 (1997). We also note that a non-model jury instruction should not be given unless the model instruction does not accurately reflect the law. *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). No such

argument is made. On that basis alone the trial court should be affirmed. Even so, there is no merit to the arguments made.

■ The first statute discusses justification for the use of "reasonable and appropriate force" in discipline. Discipline was not at issue. There is no issue of "reasonable and appropriate force." Branstetter was being tried for beating J.N. in the head so severely that he lost consciousness and died. Therefore, there was no rational basis for the instruction as offered under these facts, and its rejection was proper.

■ The second statute discusses recklessness or negligence in forming a belief on the use of force in discipline. As with the first statute, the issue is capital murder, and there is no basis for the instruction under these facts.

■ Finally, the third statute discusses accomplice liability. This court in *Jones, supra,* stated this section addresses the situation where two or more defendants are charged and tried together. Such is not the case here, and the instruction was properly refused.

### Peremptory Challenges

■ Branstetter argues the trial court erred in denying a challenge for cause on six jurors. He then alleges that because of this, he was forced to use his peremptory challenges and no longer had one to exercise on juror Bibb, the last juror seated. As to juror Bibb, counsel for Branstetter stated:

> We have no cause challenge, and, obviously we're out of peremptories, so there's nothing to prohibit Mr. Bibb from being empaneled as a juror.

Thus, there was no claim of cause. This issue was raised and recently discussed by this court in *Ferguson v. State,* 343 Ark. 159, 33 S.W.3d 115 (2000). Therein the appellant argued that because the trial court denied his motion to strike a juror for cause, he was forced to accept a juror he would have otherwise rejected by peremptory challenge. We then stated that the loss of peremptory challenges cannot be reviewed on appeal and that the appeal focuses on the people who were seated on the jury. *Ferguson, supra; Bangs v. State,* 338 Ark. 515, 998 S.W.2d 738 (1999); *Willis v. State,* 334 Ark. 412, 977 S.W.2d 890 (1998). Further, to challenge a juror on appeal, appellant must show he exhausted his peremptory challenges and

was forced to accept a juror who should have been excused for cause. As noted above, there was no challenge to Mr. Bibb for cause. Not only that, but Branstetter admits there were no grounds for cause. Therefore, this issue is without merit.

### 4-3(h) Review

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found. For the aforementioned reasons, the judgment of conviction is affirmed.

We affirm.